[Civ. No. 53288. First Dist., Div. Two. June 16, 1982.]

STANLEY FROID et al., Plaintiffs and Appellants, v.
DAVID H. FOX, as Commissioner, etc., Defendant and Respondent.

COUNSEL

Harold M. Jaffe and Stephen H. Cornet for Plaintiffs and Appellants.

George Deukmejian, Attorney General, and Julian O. Standen, Deputy Attorney General, for Defendant and Respondent.

OPINION

**MILLER, J.**—This appeal involves seven applications for payment from the Real Estate Education, Research and Recovery Fund (hereinafter Fund). The trial court granted recovery to two applicants but reduced their recovery by the amount of their tax writeoff. Five of the applicants were denied recovery on the ground that the realtor's fraud had not involved licensed activity. All the applicants appeal from this judgment.

In 1972 Fred Niergarth, a licensed real estate broker, doing business as Investment Administrators entered into a lease option agreement with Gem Properties, whereby Niergarth obtained a lease with an option to purchase certain apartment buildings in Santa Clara County. He then formed about 17 limited partnerships, with himself the general partner of each, and sold limited partnership interests to a number of investors, including appellants.

Appellants Stanley Froid and Stephen Vitkovits purchased their interests through a salesman employed by Niergarth named John Karony. Appellants T. E. Sullivan, John Rebol, Herbert Madsen, Glenn Allen and Gustave Kadach (hereinafter the Kadach Group) purchased their interests directly from Niergarth.

Although it appears that Niergarth represented that properties were to be purchased using a conventional note and deed of trust, Niergarth never exercised his option to buy the buildings and never conveyed his interest under the lease to the limited partnerships. Consequently, each investor lost his total investment.

As a result of the Froid and Vitkovits investments, John Karony received a 10 percent commission. However, Niergarth received no commission; his compensation consisted of a general partner's fee that was paid to him from the funds raised by the sale of limited partnership interests and operating fees earned for the management of the properties.

The partnerships were sold as tax shelters. Froid's writeoff on his 1973 federal return reduced this tax liability by $837. Vitkovits' writeoff reduced this 1973 federal tax liability by $1,835.14.

Froid and Vitkovits were unable to obtain service against Karony. Thus, a default judgment after publication of summons was filed against Karony. The judgment awarded Froid $5,000 plus interest and Vitkovits $5,400 plus interest. Similarly, the Kadach group brought an action against Niergarth for misrepresentation. As a result of a motion made by the Kadach group for partial summary judgment, a judgment was entered against Niergarth.

Subsequent to Froid and Vitkovits obtaining judgments against Karony and the Kadach group obtaining judgments against Niergarth, all appellants filed applications for orders directing payment out of the

Fund. On January 20, 1981, trial was held on the Fund applications. After considering written and oral arguments and reviewing papers and exhibits on file, the trial court granted recovery from the Fund in the sum of $5,000 less $837 as to Stanley Froid and $5,400 less $1,835.14 as to Stephen Vitkovits. The court denied recovery by the Kadach group.

On appeal appellants first contend that tax effects should not be taken into account in computing a recovery from the Fund.

Preliminarily, we note that appellants cite Revenue and Taxation Code section 19282, *Webb v. Standard Oil Co.* (1957) 49 Cal.2d 509 [319 P.2d 621], *Sammut v. Sammut* (1980) 103 Cal.App.3d 557 [163 Cal.Rptr. 193] and *In re Marriage of Brown* (1979) 99 Cal.App.3d 702 [160 Cal.Rptr. 524] for the proposition that tax return information is privileged and it is against public policy to permit third parties to obtain the information by adopting the indirect procedure of demanding copies of the tax returns. The above authorities are inapposite to the present case. Discovery of appellants' tax returns was never compelled; rather, both Froid and Vitkovits voluntarily submitted declarations and exhibits evidencing tax writeoffs. Thus, any privilege appellants held was waived. Moreover, appellants never raised this issue in the court below. Having failed to raise those questions, they will not be decided on appeal. (*Vogan v. McLaughlin* (1959) 172 Cal.App.2d 65, 72 [342 P.2d 18].) Accordingly, we only address statutes and case law dealing with the Fund itself.

Enacted in 1963, Business and Professions Code section 10470 et seq.[1] establishes a special fund from real estate license fees to satisfy unpaid judgments against a licensee for fraud, misrepresentation, deceit, or conversion of trust funds arising directly out of any transaction when the judgment debtor was licensed and performed acts for which a license is required. Apparently the Legislature intended minimum and limited rather than maximum benefits to those qualifying. (*Nordahl v. Department of Real Estate* (1975) 48 Cal.App.3d 657, 661 [121 Cal.Rptr. 794]; *Wolff v. Hoaglund* (1970) 11 Cal.App.3d 227, 234 [89 Cal.Rptr. 778].)

Although code sections relating to the Fund are given liberal construction because their purpose is remedial (*Antonio v. Hempel* (1977)

---

[1]All further code sections will refer to the Business and Professions Code unless otherwise indicated.

71 Cal.App.3d 128, 130 [139 Cal.Rptr. 309]; *Nordahl* v. *Department of Real Estate, supra*, 48 Cal.App.3d 657, 663), no decisions have permitted additional claims on the theory that the liberality due remedial statutes compelled them. (*Dombalian* v. *Fox* (1979) 88 Cal.App.3d 763, 766 [152 Cal.Rptr. 86].)

As originally enacted section 10471[2] allowed recovery for "actual damages." However, in 1968 the statute was amended to expressly limit recovery from the Fund to "actual and direct loss."[3] ■ "[T]he mere fact that the legislature enacts an amendment indicates that it thereby intended to change the original act by creating a new right or withdrawing an existing one. Therefore, any material change in the language of the original act is presumed to indicate a change in legal rights." (1A Sutherland, Statutory Construction (4th ed. 1973) § 22.30, p. 178, fns. omitted.)

Consistent with this rule of statutory construction, case law has held that exemplary or punitive damages that were included in the underlying judgment may not be included in an award against the Fund. (See,

[2]Former section 10471 provided: "When any aggrieved person obtains a final judgment in any court of competent jurisdiction against any person licensed under this part, upon grounds of fraud, misrepresentation or deceit with reference to any transaction for which a license is required under this part and which cause of action occurred on or after July 1, 1964, the aggrieved person may, upon termination of all proceedings including reviews and repeals in connection with the judgment, file a verified application in the court in which the judgment was entered for an order directing payment out of the Real Estate Education, Research and Recovery Fund of the amount of actual damages up to the sum of ten thousand dollars ($10,000) of the amount unpaid upon the judgment.

"A copy of the verified application must be served upon the commissioner and a certificate or affidavit of such service filed with the court."

[3]Section 10471 currently states in pertinent part: "When any aggrieved person obtains a final judgment in any court of competent jurisdiction against any person or persons licensed under this part, under grounds of fraud, misrepresentation, deceit, or conversion of trust funds arising directly out of any, transaction when the judgment debtor was licensed and performed acts for which a license is required under this part, and which cause of action occurred on or after July 1, 1964, the aggrieved person may, upon the judgment becoming final, file a verified application in the court in which the judgment was entered for an order directing payment out of the separate account in the Real Estate Fund for education, research, and recovery purposes of the amount of actual and direct loss in such transaction up to the sum of ten thousand dollars ($10,000) of the amount unpaid upon the judgment, provided that nothing shall be construed to obligate such separate account for more than ten thousand dollars ($10,000) per transaction regardless of the number of persons aggrieved or parcels of real estate involved in such transaction."

*Circle Oaks Sales Co.* v. *Smith* (1971) 16 Cal.App.3d 682, 684 [94 Cal.Rptr. 232].)

Citing *Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626 [151 Cal.Rptr. 399] and *Henninger* v. *Southern Pacific Co.* (1967) 250 Cal.App.2d 872 [59 Cal.Rptr. 76] appellants argue that tax consequences should not be considered in computing damages. While appellants correctly state that tax consequences are generally not considered in an award for damages, we think the trial court properly distinguished this case from a normal fraud action against a broker: "I would point out, just as a preface, that we are dealing here with an indemnification matter [rather] than a recovery on a suit for damages. It's been my view that the fund was set up to indemnify victims of fraud in real estate transactions. And I felt that the recovery from the fund should be limited to the minimum that would somewhat—to a limited extent reimburse the successful plaintiffs on the suit. It was for that reason that I took into consideration the tax benefits that your client would have derived here."

This view is compatible with this court's construction of section 10471's phraseology "actual and direct loss." In discussing the meaning of "actual and direct loss" the *Nordahl* court stated as follows: "The limitation of the award to that portion of the judgment representing the plaintiff's 'actual and direct loss in such transaction' does not express any intent that the plaintiff should receive anything less than that which from a monetary standpoint will serve to restore the plaintiff to the position she would have been in had [broker's] fraud not occurred. That, moreover, is the general measure of damages applicable in tort cases. As expressed in section 3333 of the Civil Code: 'For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.' Construing section 3333, this court said in *Tremeroli* v. *Austin Trailer Equip. Co.*, 102 Cal. App.2d 464, 481 [227 P.2d 923]: '*The plaintiff is entitled to be placed in the same position, from a monetary standpoint, that he would have been in, had the accident not occurred.*'" (48 Cal.App.3d at pp. 664-665, italics supplied.)

██ In the instant action, it is clear that appellants Froid and Vitkovits both received monetary tax-shelter benefits on their federal tax

returns as a result of their investments in the limited partnerships. Consequently, to place them "in the same position, from a monetary standpoint," that they would have been in had the fraud not occurred, it was appropriate to offset the loss of their investment with the pecuniary benefits received to determine "actual and direct loss" from the transaction. The court did not err in considering such tax consequences.

 Appellants next contend that the trial court erred in denying recovery to the Kadach group as to defendant Niergarth on the grounds that he was a broker acting on his own behalf. The contention is without merit.

Whether the Kadach group's judgment against Niergarth arose out of licensed activity within the meaning of section 10471 depends upon a determination that Niergarth's conduct was required to be licensed by the statute.

Section 10131[4] defines a real estate broker as a "person who, for a compensation or an expectation of compensation does or negotiates to do" specified acts dealing with real estate "for another." Similarly, section 10131.3 defines a real estate broker as "a person who, for another or others, for compensation or in expectation of compensation, issues or sells, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale, or exchange of securities as specified in Section 25206 of the Corporations Code." Consequently two preliminary requirements must be met for a finding that an individual is acting as a broker: 1) the person is acting for compensation; and 2) the person is acting on behalf of someone else. In addition, section 10133 provides in part that the aforementioned definitions of real estate broker do not include "[a]nyone who directly performs any of the acts within the scope of this chapter with reference to his own property or, in the case of a corporation which, through its regular officers receiving no special compensation therefor, performs any of the acts with reference to the corporation's own property."

---

[4]Section 10131 states: "A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, does or negotiates to do one or more of the following acts for another or others:

"(a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity.

"(b) Leases or rents or offers to lease or rent, or places for rent, or solicits listings of places for rent, or solicits for prospective tenants, or negotiates the sale, purchase or ex-

■ Thus, it is well established that a broker is the agent of his principal; his role being to bring buyer and seller together with the aim of consummating a sale. (*Robinson* v. *Murphy* (1979) 96 Cal.App.3d 763, 767 [158 Cal.Rptr. 246]; *Rhode* v. *Bartholomew* (1949) 94 Cal.App.2d 272, 278 [210 P.2d 768].) A person is not acting as a broker when he deals with his own property. (*Robinson* v. *Murphy, supra,* 96 Cal.App. 3d 763, 768; *McGaughey* v. *Fox* (1979) 94 Cal.App.3d 645, 651 [156 Cal.Rptr. 593]; *Williams* v. *Kinsey* (1946) 74 Cal.App.2d 583, 592 [169 P.2d 487].)

■ Appellants first maintain that Niergarth's compensation consisted of general partnership fees that were paid to him from the sale of limited partnership interests. This strained argument is self defeating. By definition any compensation paid to Niergarth was for his services as general partner and not for services as a broker.

Appellants also contend that since Niergarth was not selling his own property the above-cited cases are inapplicable to their applications. Appellants go to great length to distinguish *McGaughey* v. *Fox, supra,* from the instant action.

In *McGaughey*, a limited partnership agreement was entered into by one Oren, as the general partner, and Wilton Associates, Inc., as a limited partner. The name of the partnership was Pierce Oak Park Apartments. The partnership capital was to be derived from the sale of 300 investment units, for $1,000 each, to limited partners. The general partner was considered a limited partner as well, to the extent that it contributed to capital by acquiring investment unit holdings. The agreement also granted to the general partner "exclusive license to act as agent for the sale of the partnership property," for which services it was entitled to compensation in the form of a brokerage commission of six percent of the gross selling price of the property. Because Oren was

---

changes of leases on real property, or on a business opportunity, or collects rents from real property, or improvements thereon, or from business opportunities.

"(c) Assists or offers to assist in filing an application for the purchase or lease of, or in locating or entering upon, lands owned by the state or federal government.

"(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on, real property or on a business opportunity.

"(e) Sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract, or a promissory note secured directly or collaterally by a lien on real property or on a business opportunity, and performs services for the holders thereof."

only able to raise 60 percent of the purchase price of Pierce Oak Park Apartments through limited partnership investments, the seller agreed to accept 40 percent interest in the partnership as both a limited and a general partner. Thereafter, Oren resigned as general partner, leaving the seller as the remaining general partner. Subsequent to the close of escrow, plaintiff purchased a 9.7 percent limited partnership interest (consisting of 29.1 investment units) held by Oren. No part of the consideration was transferred by Oren to the partnership. After plaintiff received a default judgment in the principal sum of $29,100 against Oren, he applied for an order of the court directing payment from the Fund. The trial court denied the application on the grounds that the investment transaction between plaintiff and Oren did not require a real estate license.

The appellate court affirmed the lower court's judgment on the following reasoning: "The investment units were created to raise capital for the partnership by their sale to limited partners. Thus, they initially were the property of the partnership (see Civ. Code, § 684) and Oren, in effecting an original sale of investment units by the partnership to a limited partner, undoubtedly would have been acting for the partnership. However, upon a sale of investment units by the partnership to a limited partner, the units ceased to be the property of the partnership and became the property of the limited partner purchasing them; they were his individual interest in the partnership, representing his share of partnership profits and surplus." (94 Cal.App.3d at p. 650.)

Appellants assert that unlike Oren in *McGaughey*, Neirgarth was not a limited partner and was not selling his own limited partnership interest; rather "Niergarth, in effecting an original sale of investment units in the various limited partnerships he formed, was acting for the partnerships and therefore was required to have a license."

The fallacy in appellants' position is that at the time Niergarth was soliciting and selling limited partnership interests, there were no existing partnerships. Unlike the situation in *McGaughey* where the partnership of Pierce Oak Park Apartments had been formed pursuant to a limited partnership agreement entered into by Oren and Wilton Associates, Inc., prior to the sale of Oren's limited partnership interest to McGaughey, here no partnerships existed. How then could it be said that prior to the creation of the partnerships Niergarth was acting as an agent for the partnerships? It appears to this court that Niergarth, acting for himself rather than for another, was creating limited

partnerships with himself as general partner of each. Such an activity does not require a real estate broker's license. Even if it is assumed that the partnership interests were securities within the meaning of section 10131.3, it remains clear that Niergarth was selling them on his own behalf and not for compensation.

The judgment is affirmed.

Rouse, Acting P. J., and Smith, J., concurred.

A petition for a rehearing was denied July 12, 1982.