196 Cal.App.3d 575 (1987)
242 Cal. Rptr. 88
NANCY STICKEL, Plaintiff and Respondent,
v.
JOSEPH M. HARRIS et al., Defendants and Appellants.
Docket No. A035933.
Court of Appeals of California, First District, Division Four.
November 24, 1987.
*579 COUNSEL
Wayne L. Bender, L. Joanne Sakai and Rosenblum, Parish & Bacigalupi for Defendants and Appellants.
Wayne H. Thomas for Plaintiff and Respondent.
OPINION
POCHE, J.
The issue presented is whether a loan bearing a 30 percent annual rate of interest obtained by a licensed real estate broker on behalf of himself and certain fellow partners and joint venturers is exempt from the interest limitations of the usury law.

BACKGROUND
In December of 1980 Nancy Stickel was approached by Robert Butticci, a licensed real estate broker, with a short-term investment proposal. Butticci told Stickel that he and his partners Joseph Atencio and Joseph Harris wanted her to invest in a joint venture project involving the purchase of real estate on Corbett Avenue upon which condominiums would be constructed.[1] As an inducement Butticci offered to pay first 25 percent and then 30 percent interest on any amount loaned, assuring Stickel that neither rate of return was usurious. Stickel eventually provided Butticci and Atencio with $74,000 for the project. The rate of interest was set at 30 percent for the duration of the loan, which was to be repaid by April 15, 1981. The loan was secured by deeds of trust on the property.
*580 Butticci and Atencio made one interest payment to Stickel, in February of 1981. That same month they advised Stickel that they would be able to repay her loan ahead of schedule. They inquired whether Stickel would be interested in "rolling over" the loan so that they could acquire two lots on Burnett Avenue in San Francisco for a new construction project. Stickel advanced an additional $30,000, bringing the total amount of the loan to $104,000. A promissory note for this amount was executed on April 15, 1981, by Butticci, Atencio and Harris. The note specified that the obligation would bear "interest from April 15, 1981, until paid at the rate of 30% per cent [sic] per annum, payable beginning May 15th, 1981, at a monthly rate of $2,600.00" for its term of six months. The loan was initially secured by the deeds of trust respecting the Corbett Avenue property; the Burnett Avenue lots were subsequently substituted as security for the note. This deed, which was also executed by Butticci, Atencio and Harris,[2] was subordinate to a deed of trust in favor of Mr. and Mrs. Chow.
Stickel agreed to the partners' request that the term of the loan be extended, first to November and then to December of 1981. In December of 1981 Stickel agreed to a further extension of the loan for an additional 12 months when the interest rate was increased to 32.5 percent.
The partners thereafter began experiencing severe financial difficulties. In April of 1982 the Chows declared a default and initiated proceedings to foreclose their security interest in the property. During the latter part of 1982 the interest payments to Ms. Stickel were drastically reduced. (See fn. 3, post.) On September 23, 1982, the Chows purchased the property at a *581 trustee's sale. From May of 1981 through November of 1982 Stickel received interest payments totaling $36,266.68.[3]
Ms. Stickel commenced this action against Harris and HEMI (hereinafter collectively referred to as defendants) for recovery of the principal and accumulated interest on the promissory note.[4] At the conclusion of a nonjury trial, the court entered judgment against defendants holding them jointly and severally liable for (among other things) the $104,000 principal of the note and interest accrued at the rate of 30 percent in the amount of $125,703.31. Thereupon ensued this timely appeal by defendants.

REVIEW

I
During the 1970's there was a widely perceived need in California for a greater infusion of investment capital into the field of real estate lending. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Special Statewide Election (Nov. 6, 1979), argument in favor of Prop. 2, pp. 12-13; Crutto, Conflict of Laws and Usury in California: The Impact on Flow of Mortgage Funds (1975) 9 U.S.F.L.Rev. 441, 463; Preble & Herskowitz, Recent Changes in California and Federal Usury Laws: New Opportunities for Real Estate and Commercial Loans? (1979) 13 Loyola L.A.L.Rev. 1, 1-3; Comment, The Usury Exemption: Should It Apply to Real Estate Brokers Making Loans? (1986) 26 Santa Clara L.Rev. 403, 406-407.) Responding to this need, the voters of California in November of 1979 adopted a ballot measure which made radical revisions in the state Constitution's usury provisions. One of those revisions was to exempt from all interest restrictions "any loans, made or arranged by any person licensed as a real estate broker by the State of California and secured in whole or in part by liens on real property." (Cal. Const., art. XV, § 1.)
The Legislature sought to clarify the scope of the constitutional provision by adding section 1916.1 to the Civil Code in 1983. (Stats. 1983, ch. 307, § 1, p. 899.) As amended in 1985 (Stats. 1985, ch. 489, § 1), that statute (which will hereinafter be cited as section 1916.1) currently provides: "The restrictions *582 upon rates of interest contained in Section I of Article XV of the California Constitution shall not apply to any loan or forbearance made or arranged by any person licensed as a real estate broker by the State of California, and secured, directly or collaterally, in whole or in part by liens on real property. For purposes of this section, a loan or forbearance is arranged by a person licensed as a real estate broker when the broker (1) acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan for another, (2) acts for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business for another and (A) arranges a loan to pay all or any portion of the purchase price of, or of an improvement to, that property or business or (B) arranges a forbearance, extension, or refinancing of any loan in connection with that sale, purchase, lease, exchange of, or an improvement to, real property or a business, or (3) arranges or negotiates for another a forbearance, extension, or refinancing of any loan secured by real property in connection with a past transaction in which the broker had acted for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business. The term `made or arranged' includes any loan made by a person licensed as a real estate broker as a principal or as an agent for others, and whether or not the person is acting within the course and scope of such license."[5]
(1a) There being no question that Butticci did not make the loan, the sole question is whether his involvement qualifies the loan as one "arranged by ... a real estate broker" for purposes of the exemption. The trial court, in a 22-page "Statement of Decision and Judgment" which is a model of clarity and precision and whose detailed treatment of the issues has been of considerable assistance, determined that it did. We agree.
(2) There is no difficulty with the general proposition that when a broker is the recipient of a loan secured by real property owned by the broker, the transaction is not one for which a broker's license is required. So much is now settled for purposes of Business and Professions Code section 10131, the fundamental statute specifying activities  including loan solicitation  *583 for which a broker's license is required.[6] The natural corollary of this proposition is that a license is necessary only if the broker engages in such activities as the agent of others. (See Stout v. Edmonds (1986) 180 Cal. App.3d 66, 69-70 [225 Cal. Rptr. 345]; Froid v. Fox (1982) 132 Cal. App.3d 832, 839-840 [183 Cal. Rptr. 461]; Robinson v. Murphy (1979) 96 Cal. App.3d 763, 767-768 [158 Cal. Rptr. 246].)
Given unmistakable parallels of language, it is both logical and appropriate for section 1916.1 to be construed in light of Business and Professions Code section 10131. (See Building Material & Construction Teamsters' Union v. Farrell (1986) 41 Cal.3d 651, 665 [224 Cal. Rptr. 668, 715 P.2d 648]; B.W. v. Board of Medical Quality Assurance (1985) 169 Cal. App.3d 219, 231 [215 Cal. Rptr. 130].) (3) It should therefore come as no surprise that courts construe section 1916.1 to mean that "a loan is arranged by a person licensed as a real estate broker only if two things occur. One is that the broker acts for another or others, not for himself. The other is that he receives or expects to receive compensation." (Green v. Future Two (1986) 179 Cal. App.3d 738, 742-743 [225 Cal. Rptr. 3]; see Garcia v. Wetzel, supra, 159 Cal. App.3d 1093 at pp. 1096-1097; Froid v. Fox, supra, 132 Cal. App.3d 832 at p. 839.)[7] Stated conversely, "where the transaction is *584 between borrower and lender, each acting on his own behalf, and there is no third party licensed real estate broker acting for compensation as intermediary, the loan is not `arranged' by a broker within the meaning of the usury law." (Winnett v. Roberts, supra, 179 Cal. App.3d 909 at p. 921.)
(1b) Precisely what constitutes "compensation" for purposes of section 1916.1 is a question of first impression. Within the context of other statutes, compensation is a concept which has received an extremely broad definition sufficient to encompass the receipt of just about any form of monetary or tangible benefit that is not self-bestowed. (See, e.g., Gillespie v. Rawlings (1957) 49 Cal.2d 359, 364-365 [317 P.2d 601]; Martinez v. Southern Pacific Co. (1955) 45 Cal.2d 244, 249-251 [288 P.2d 868]; In re Porterfield (1946) 28 Cal.2d 91, 99 [168 P.2d 706, 167 A.L.R. 675]; Lubeck v. Lopes (1967) 254 Cal. App.2d 63, 72 [62 Cal. Rptr. 36]; Estate of Worley (1948) 87 Cal. App.2d 760, 764 [197 P.2d 773]; Hughson Con. Milk Co. v. State Board (1937) 23 Cal. App.2d 281, 285-286 [73 P.2d 290]; 32 Ops.Cal.Atty.Gen. 210, 211-212 (1958).) "[T]he nature of compensation ... is as variable as the particular facts involved." (McCann v. Hoffman (1937) 9 Cal.2d 279, 283 [70 P.2d 909].) The term "interest" has been treated with a similar expansiveness. (See In re Fuller (1940) 15 Cal.2d 425, 434 [102 P.2d 321]; Thunderbird Investment Corp. v. Rothschild (1971) 19 Cal. App.3d 820, 829 [97 Cal. Rptr. 112].)
Whether a payment, advantage, benefit, or other form of consideration amounts to compensation has traditionally been regarded as an issue to be decided by the trier of fact. (See Martinez v. Southern Pacific Co., supra, 45 Cal.2d 244 at p. 250; Follansbee v. Benzenberg (1954) 122 Cal. App.2d 466, 471 [265 P.2d 183, 42 A.L.R.2d 832]; Hyman v. Hyman (1950) 98 Cal. App.2d 463, 472 [220 P.2d 623].) (4) In usury cases the trier of fact is vested with the power to resolve many issues attending and including the ultimate question of whether a particular transaction is usurious. (See Boerner v. Colwell Co. (1978) 21 Cal.3d 37, 44 [145 Cal. Rptr. 380, 577 P.2d 200]; West Pico Furniture Co. v. Pacific Finance Loans (1970) 2 Cal.3d 594, 603 [86 Cal. Rptr. 793, 469 P.2d 665]; Forte v. Nolfi (1972) 25 Cal. App.3d 656, 678 [102 Cal. Rptr. 455].) (1c) By parity of reasoning, it follows that the issue of whether Butticci "arranged" a nonusurious loan within the meaning of section 1916.1 was likewise committed to the trier of fact unless, as a matter of law, a given transaction failed to meet the two-prong test cited previously. The only task confronting us is to decide if the trial court's determination that the loan was exempt can claim the support of substantial evidence considered by the trial court in its capacity as the trier of fact. (Munoz v. Olin (1979) 24 Cal.3d 629, 635-636 [156 Cal. Rptr. 727, 596 P.2d 1143]; Janisse v. Winston Investment Co. (1957) 154 Cal. App.2d 580, 582 [317 P.2d 48, 67 A.L.R.2d 225].)
*585 Regardless of whether it is an actual requisite for application of the exemption (see fn. 7, ante), Butticci was clearly acting in a licensed capacity. He did need a broker's license to solicit the loan. (See Bus. & Prof. Code, § 10131, subd. (d), quoted at fn. 6, ante.) It is undisputed that he was not soliciting the loan for himself, but as the intermediary for the partnership and the joint venture. (5) (See fn. 8.), (1d) Butticci did not forfeit this status solely because he became a member of these entities.[8] Butticci testified that he expected to be compensated when the profits generated by sale of the condominiums were paid to the partners at the conclusion of the project.[9] By obtaining the financial wherewithal which would enable the partnership and the joint venture to operate, he was providing a vital service from which all involved would benefit. Those benefits would accrue to all of the partners and joint venturers, who would each obtain a pro rata share of the ultimate profits. The fact that Butticci's reward would be deferred until a later time is of no moment. Anticipated profits qualify as compensation. (Martinez v. Southern Pacific Co., supra, 45 Cal.2d 244 at p. 251; Halbert v. Berlinger (1954) 127 Cal. App.2d 6, 19 [273 P.2d 274]; Follansbee v. Benzenberg, supra, 122 Cal. App.2d 466 at p. 471; Piercy v. Zeiss (1935) 8 Cal. App.2d 595, 598 [47 P.2d 818].) Accordingly, substantial evidence supports the trial court's finding that Butticci solicited the loan with an expectation of compensation. This finding in turn supports the court's determination that the loan was exempted by section 1916.1 from the interest limitations of the usury law.

II
Anticipating this conclusion, defendants attempt to defeat it with three arguments directed to various weaknesses they perceive in the preceding *586 analysis. These arguments will be discussed in the ascending order of their difficulty.

(A)
(6) Defendants first contend that it is a logical absurdity to conclude that Butticci was acting for the joint venture in April and May of 1981 because that entity had not yet been formed. As they see it, Butticci could not have been acting for the joint venture which was still to achieve an existence independent of its constituent members. This contention is without merit.
There is undeniable appeal to defendants' claim that to treat Butticci as acting on the ostensible behalf of an entity not yet created is in effect to put the cart before the horse. In addition to simple logic, this proposition finds support in the record. The Burnett Avenue lots do indeed appear to have been purchased before the joint venture was formed (see fn. 2, ante), but this fact is not fatal to plaintiff's recovery. Logic can cut two ways. The most obvious and comparable analogy is the situation of preincorporation contracts by corporate promoters. If the subsequently formed corporation ratifies such a contract by knowingly accepting its benefits, the promoters' contract becomes an obligation of the corporation and enforceable against it. (See Biggart v. Lewis (1920) 183 Cal. 660, 665 [192 P. 437]; Scadden Flat G.M. Co. v. Scadden (1898) 121 Cal. 33, 38 [53 P. 440]; Citizens Suburban Co. v. Rosemont Dev. Co. (1966) 244 Cal. App.2d 666, 676-677 [53 Cal. Rptr. 551]; White v. Kaiser-Frazer Corp. (1950) 100 Cal. App.2d 754, 760 [224 P.2d 833]; cf. Civ. Code, § 1589.) There is no reason in law or logic why this reasoning should not extend to partnerships and joint ventures. Certainly there can be no objection to either the partnership or the joint venture taking over an asset initially owned by one or more of its originators and intended for the joint venture's ultimate use or benefit. (See Perelli-Minetti v. Lawson (1928) 205 Cal. 642, 648 [272 P. 573]; McNab v. Mills (1926) 199 Cal. 231, 234 [248 P. 657]; Duryea v. Burt (1865) 28 Cal. 569, 588-589 (conc. opn. of Sawyer, J.); Gray v. Palmer (1858) 9 Cal. 616, 639; Cochran v. Board of Supervisors (1978) 85 Cal. App.3d 75, 81-83 [149 Cal. Rptr. 304]; Annot., When Real Estate Owned by Partner Before Formation of Partnership Will Be Deemed to Have Become Asset of Firm (1956) 45 A.L.R.2d 1009; cf. Ellis v. Mihelis (1963) 60 Cal.2d 206, 218-219 [32 Cal. Rptr. 415, 384 P.2d 7]; Redwood City Salt Co. v. Whitney (1908) 153 Cal. 421, 422 [95 P. 885]; Corp. Code, § 15008.)
Certainly Butticci's competence and authority as a member of either the partnership and joint venture, if these entities had then been in existence, would extend to binding those entities to the loan, a matter fundamental to *587 their purpose. (See Corp. Code, § 15009, subd. (1); Ellis v. Mihelis, supra, 60 Cal.2d 206 at pp. 217-218; Owens v. Palos Verdes Monaco (1983) 142 Cal. App.3d 855, 864-866 [191 Cal. Rptr. 381]; Medak v. Cox (1970) 12 Cal. App.3d 70, 76, fn. 2 [90 Cal. Rptr. 452]; Deicher v. Corkery (1962) 205 Cal. App.2d 654, 662 [23 Cal. Rptr. 270].) The issue then becomes whether either or both of these entities, once activated, ratified Butticci's actions. Clearly, ratification did occur. This is evident from (1) the interest payments apparently made by partners Atencio and Butticci on behalf of the joint venture; (2) the imperative need of both the partnership and the joint venture to obtain the lots purchased with plaintiff's money and subject to her deed of trust; and (3) the assumption by the joint venture of the ultimate responsibility to discharge all obligations. The logic of the maxim post hoc ergo propter hoc[10] defeats defendants' first argument respecting Butticci's nonexistent principals.

(B)
At the time it added section 1916.1 the Legislature made a finding to the effect that the amendment of the state Constitution's usury provisions "established an additional class exempt from interest rate limitations for persons licensed as real estate brokers by the State of California on the basis that real estate brokers are qualified by the state on the basis of education, experience, and examination, and that the licenses of real estate brokers can be revoked or suspended if real estate brokers perform acts involving dishonesty, fraud, or deceit with intent to substantially benefit themselves or others, or to substantially injure others." (Stats. 1983, ch. 307, § 2, p. 899.) (7), (8a) Defendants invoke this justification for the broker exemption, which does not apply to brokers acting solely as borrowers (see Winnett v. Roberts, supra, 179 Cal. App.3d 909 at p. 920), to support their contention that because Butticci did not need a license to borrow Stickel's money and was not being compensated for negotiating the loan, he was not acting in a licensed capacity and was therefore not subject to professional discipline. This argument leaves us unmoved.
Defendants fail to appreciate that Butticci was not acting exclusively as a borrower; he was simultaneously acting as an agent soliciting the loan on behalf of others, conduct for which a license was required by Business and Professions Code section 10131, subdivision (d). The compensation aspect of defendants' position will be addressed at greater length in the next section, but it must now be considered within the context of the Commissioner of Real Estate's statutory powers to discipline holders of real estate licenses issued by the state.
*588 Business and Professions Code sections 10176 and 10177 detail the multitude of sins for which a real estate license may be either revoked or suspended. It is not necessary at this point to examine the precise and intricate nature of these numerous professional misfeasances, malfeasances, and nonfeasances; only a few need be mentioned to demonstrate the soundness of defendants' argument. Although an early version of Business and Professions Code section 10176 was construed to bar revocation of a license unless the holder was "acting for a compensation" (Schomig v. Keiser (1922) 189 Cal. 596, 598 [209 P. 550]), regulation of the profession under the current versions of these statutes is not dependent upon remuneration. License holder discipline is warranted following conviction for a felony or crime involving moral turpitude if "substantially related to the qualifications, functions or duties" of the licensee's business. (Bus. & Prof. Code, §§ 480, subd. (a), 10177, subd. (b).) The same is true for persons "making any material misstatement of fact in an application for a real estate license, license renewal or reinstatement." (Bus. & Prof. Code, § 10177, subd. (a).) Revocation has been upheld for failing to maintain accounts and records in compliance with administrative regulation. (Bus. & Prof. Code, § 10177, subd. (d); Apollo Estates, Inc. v. Department of Real Estate (1985) 174 Cal. App.3d 625, 636-640 [220 Cal. Rptr. 199].) Filing false statements with government agencies is also cause for discipline. (See Arneson v. Fox (1980) 28 Cal.3d 440, 444, 450-451 [170 Cal. Rptr. 778, 621 P.2d 817]; Handeland v. Department of Real Estate (1976) 58 Cal. App.3d 513, 516-517 [129 Cal. Rptr. 810].) In none of these instances is the power to discipline predicated upon the existence or expectation of gain, profit, or compensation. (9) (See fn. 11.) Similarly, there is no requirement that the client or any party suffer actual loss. (See Buckley v. Savage (1960) 184 Cal. App.2d 18, 31-32 [7 Cal. Rptr. 328]; 11 Ops.Cal.Atty.Gen. 108, 109-110 (1948).)[11]
(10) One of the general aims of the commissioner's power to regulate real estate licensees is to ensure that the holders of state licenses will be honest and truthful in their dealings and will maintain a good reputation. (Riley v. Chambers (1919) 181 Cal. 589, 593 [185 P. 855, 8 A.L.R. 418]; State of California v. Superior Court (1984) 150 Cal. App.3d 848, 856 [197 Cal. Rptr. 914]; Brown v. Gordon (1966) 240 Cal. App.2d 659, 667 [49 Cal. Rptr. 901]; Buckley v. Savage, supra, 184 Cal. App.2d 18 at pp. 31-32.) (8b) Courts have recognized that the regulatory power operates within exceedingly broad chronological and substantive boundaries, the better to promote this aim. It has thus been held that conduct within the statutes may form the basis for discipline even "though occurring before the issuance of the license which is the subject of a particular suspension or *589 revocation." (Grand v. Griesinger (1958) 160 Cal. App.2d 397, 410-411 [325 P.2d 475].) Moreover, "licensees may be disciplined for misconduct unrelated to their activities as such licensees" (Jennings v. Karpe (1974) 36 Cal. App.3d 709, 712 [111 Cal. Rptr. 776] [original italics]) and that facilitation of the regulatory goal "`allows disciplinary action against real estate brokers for their conduct in other fields of endeavor.'" (Id. at p. 711 [citing and quoting Buckley v. Savage, supra, at p. 31].)
A wayward licensee is not a loose cannon free to inflict havoc upon an unsuspecting public, untethered by the regulatory power of the authority which provided that license. That power could have reached Butticci even if his sole identity had been that of a borrower acting in a purely personal capacity. (See Borror v. Department of Investment (1971) 15 Cal. App.3d 531, 536, 544-546 [92 Cal. Rptr. 525].) Acting as he was in negotiating the loans on behalf of others and in expectation of compensation, Butticci was performing in his licensed capacity and was thus subject to the state's authority to discipline him. There is consequently no basis for excluding this transaction from the usury exemption as defendants suggest.

(C)
(11a) Defendants' final argument is the most interesting. They contend that there must be a causal nexus between the acts for which a broker's license is required and the compensation received therefor. They argue that there can be no exemption unless Butticci either received or expected to receive compensation for soliciting the loans, compensation which in their view must be separate and independent from his entitlement to a share of the joint venture's profits.[12] It is conceded by all that Butticci did not receive any fee or commission for negotiating the loans from Ms. Stickel; his sole remuneration was to have been the profits he expected from the ultimate success of the joint venture.
Defendants claim to find support for their position in the wording of section 1916.1, particularly that language providing that "a loan ... is arranged by a person licensed as a real estate broker when the broker ... acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan...." (Italics added.) This language does lend a measure of plausibility to defendant's construction, yet the statute as a whole does not compel defendants' argument to prevail.
*590 Section 1916.1 also specifies that a loan is arranged, and thus exempt, if a broker "negotiates for another a forbearance, extension, or refinancing of any loan ... in connection with a past transaction in which the broker had acted for compensation or in expectation of compensation...." (Italics added.) The clear import of this language is that the receipt or expectation of compensation can precede activities for which a broker's license is required without depriving the undertaking of its status as an exempt transaction. A broker's subsequent expenditure of additional efforts to preserve an accrued expectation of compensation does not, as a matter of law, demand a separate enhancement of the previously agreed upon compensation. Such is clearly within contemplation of section 1916.1 and is thus incompatible with defendants' requirement of subsequent and separate remuneration.
A more explicit foundation for defendants' position is Business and Professions Code section 10133, subdivision (a)(1) (hereinafter cited as subdivision (a)(1)), which at present provides in pertinent part: "(a) The acts described in Section 10131 are not acts for which a real estate license is required if performed by: (1) A regular officer of a corporation or a general partner of a partnership with respect to real property owned or leased by the corporation or partnership, respectively, or in connection with the proposed purchase or leasing of real property by the corporation or partnership, respectively, if the acts are not performed by the officer or partner in expectation of special compensation. ..." (Italics added.) The express language of this statute is equivalent to the construction of section 1916.1 defendants would have us adopt. We are constrained from doing so for the following reasons.
Within the context of this case, the amended versions of section 1916.1 and subdivision (a)(1) are clearly in pari materia to the issue of broker compensation and can therefore be construed in light of each other. (See Hunstock v. Estate Development Corp. (1943) 22 Cal.2d 205, 210-211 [138 P.2d 1, 148 A.L.R. 968]; Gonzales & Co. v. Department of Alcoholic Bev. Control (1984) 151 Cal. App.3d 172, 178 [198 Cal. Rptr. 479]; Guthman v. Moss (1984) 150 Cal. App.3d 501, 508 [198 Cal. Rptr. 54].) (12) "`"[A]pplication of the rule that statutes in pari materia should be construed together is most justified, and light from that source has the greatest probative force, in the case of statutes relating to the same subject matter that were passed at the same session of the [L]egislature, especially if they were passed or approved or take effect on the same day...."'" (International Business Machines v. State Bd. of Equalization (1980) 26 Cal.3d 923, 932 [163 Cal. Rptr. 782, 609 P.2d 1]; accord People v. Caudillo (1978) 21 Cal.3d 562, 585 [146 Cal. Rptr. 859, 580 P.2d 274]; 2A Sutherland, Statutory Construction (4th ed. 1984) § 51.03, p. 469; see Raynor v. City of Arcata (1938) 11 Cal.2d 113, 118 [77 P.2d 1054]; People v. Jackson *591 (1866) 30 Cal. 427, 430; Kriz v. Taylor (1979) 92 Cal. App.3d 302, 311 [154 Cal. Rptr. 824]; Old Homestead Bakery, Inc. v. Marsh (1925) 75 Cal. App. 247, 259 [242 P. 749].) Final legislative action on the amendments to section 1916.1 and subdivision (a)(1) occurred on August 22, 1985, and both measures were approved by the Governor on September 6, 1985. (See Sen. Final Hist. (1985-1986 Reg. Sess.) pp. 382, 759.) Both became effective January 1, 1986. (Cal. Const., art. IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).)
(11b) Defendants' construction of section 1916.1, read in conjunction with subdivision (a)(1), must be rejected. Taken together, the concept of "special compensation" found in subdivision (a)(1) must be confined to that statute. The Legislature had the opportunity to import that concept into section 1916.1, but it must be presumed that it consciously and deliberately refused to do so. (13) It is therefore appropriate to invoke the principles that "[w]here a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted" (Marsh v. Edwards Theatres Circuit, Inc. (1976) 64 Cal. App.3d 881, 891 [134 Cal. Rptr. 844]; accord Balboa Ins. Co. v. Aguirre (1983) 149 Cal. App.3d 1002, 1008 [197 Cal. Rptr. 250]; Fogarty v. Superior Court (1981) 117 Cal. App.3d 316, 320 [172 Cal. Rptr. 594]), and that "`[t]he failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended.'" (Estate of McDill (1975) 14 Cal.3d 831, 837-838 [122 Cal. Rptr. 754, 537 P.2d 874]; accord Bailey v. Superior Court (1977) 19 Cal.3d 970, 977-978, fn. 10 [140 Cal. Rptr. 669, 568 P.2d 394]; People ex rel. Dept. of Transportation v. Union Pacific Land Resources Corp. (1986) 179 Cal. App.3d 307, 315 [224 Cal. Rptr. 487]; State of California ex rel. Dept. of Transportation v. Superior Court (1984) 159 Cal. App.3d 331, 338 [205 Cal. Rptr. 518].) Read in conjunction with the legislative history of the two statutes, defendants' statutory argument must be viewed as untenable. (11c) Our limited function as the implementors of the Legislature's intent and purpose requires us to hold that the concept of "special compensation" expressed in subdivision (a)(1) cannot be transferred to section 1916.1 as defendants desire.
This holding is, however, limited by the circumstances of this case. The matter of subdivision (a)(1) was initially raised by this court. (14) None of the parties have ever argued that this statute in its present form is retroactive to this case. "[L]egislative enactments are generally presumed to operate prospectively and not retroactively." (In re Marriage of Bouquet (1976) 16 Cal.3d 583, 587 [128 Cal. Rptr. 427, 546 P.2d 1371]; see Civ. *592 Code, § 3.) Nothing in the statute's language compels a departure from this rule. The amendment was certainly not intended to qualify as a clarification of existing law.[13] (Cf. Bowen v. Board of Retirement (1986) 42 Cal.3d 572, 575, fn. 3 [229 Cal. Rptr. 814, 724 P.2d 500].) In addition, retroactive application would entail impairment of plaintiff's vested and accrued cause of action. (See White v. Western Title Ins. Co. (1985) 40 Cal.3d 870, 884 [221 Cal. Rptr. 509, 710 P.2d 309]; Southern Cal. Gas Co. v. Public Utilities Com. (1985) 38 Cal.3d 64, 67 [211 Cal. Rptr. 99, 695 P.2d 186]; White v. Lyons (1871) 42 Cal. 279, 284-285.) Accordingly, although we find that subdivision (a)(1) is not to be retroactively applied on this appeal, we express no opinion concerning its operation in future situations involving similar circumstances. Our discussion of subdivision (a)(1) is therefore confined to its use in illustrating the nature of the argument before us.
There is an additional reason for rejecting defendants' "special compensation" argument. (15) The joint venture and its members' rights, duties and liabilities are governed by the same principles which apply to a partnership. (Zeibak v. Nasser (1938) 12 Cal.2d 1, 12 [82 P.2d 375]; Bank of California v. Connolly (1973) 36 Cal. App.3d 350, 371-372 [111 Cal. Rptr. 468]; Cahill Bros., Inc. v. Clementina Co. (1962) 208 Cal. App.2d 367, 388 [25 Cal. Rptr. 301].) (11d) Butticci was thus subject to the rule that "[a]bsent an express agreement, a partner is not entitled to any compensation for his services to the partnership other than his share of the profits" (Wind v. Herbert (1960) 186 Cal. App.2d 276, 286 [8 Cal. Rptr. 817]; accord Estate of McConnell (1936) 6 Cal.2d 493, 497 [58 P.2d 639]; Nevills v. Moore Min. Co. (1902) 135 Cal. 561, 564 [67 P. 1054]; Van Ruiten v. Van Ruiten (1969) 268 Cal. App.2d 619, 624 [74 Cal. Rptr. 186]; Hargiss v. Royal Air Properties, Inc. (1962) 206 Cal. App.2d 414, 416 [23 Cal. Rptr. 683]), a rule embodied in the Uniform Partnership Act adopted by California. (Corp. Code, § 15018, subd. (f).) The Burnett Avenue limited partnership agreement does not provide for any compensation other than distributed profits, but it did obligate Butticci to "devote whatever time, effort and skill may be necessary for the conduct of the Partnership's business." Defendants are therefore insisting that the joint venture had to contravene its basic charter and breach statutory law by paying Butticci a separate compensation in order to be eligible for the exemption. What defendants would *593 demand is at odds with the legal preference for settled agreements governing the compensation of joint venturers.[14]

III
The net effect of the creative arguments deployed by defendants is that when a broker solicits and borrows money for himself and others organized as either a partnership or a joint venture to develop housing, and if there is an intent at some future point to divide profits realized from utilization of the loan, the broker will not be compensated and thus has no need of a broker's license in order to solicit the loan. They would require that the broker be given separate and special compensation for each act he might contribute to the ultimate success of the partnership or joint venture lest the broker lose the status they see as a prerequisite for the exemption of section 1916.1. This is unreasonable, not only in terms of the commercial reality of an ongoing business requiring the flexibility to meet unforeseen circumstances (cf. Reuschlein & Gregory, The Law of Agency & Partnership and Other Unincorporated Business Organizations (1979) § 186, pp. 273-275), but also in its disregard for settled legal principles in several fields. If accepted as a rule of decision, defendants' arguments would impede the goal, expressed by both the electorate and the Legislature, of facilitating loans to alleviate the housing shortage throughout California. (Cf. Stats. 1979, ch. 1043, §§ 1-3, pp. 3643-3644.) We concur with the trial court's refusal to do so.
*594 The judgment is affirmed. The parties shall bear their respective costs on appeal.[15]
Anderson, P.J., concurred.
Sabraw, J., concurred in the result only.
Appellants' petition for review by the Supreme Court was denied February 17, 1988.
NOTES
[1] The actual joint venturers for the Corbett Avenue project were a limited partnership comprised of Atencio, Butticci and Sheltered Financial Services, Inc. (Sheltered Financial), together with H & E Management, Inc. (HEMI), an entity involved in the acquisition, refurbishment, and sale of residential property in San Francisco. Atencio and Butticci were the president and vice president, respectively, of Sheltered Financial. Harris was the sole officer, director and shareholder of HEMI, which held title to the property.
[2] The deed is inconsistent as to the matter of the trustees' identity. At one point the trustees are identified as HEMI and Sheltered Financial, each of which was described as possessing "an undivided 1/2 interest" in the property. Beneath the part for "Signature of Trustor" at another part of the deed appear the signatures of Harris (on behalf of HEMI), Atencio (on behalf of Sheltered Financial) and Butticci.

The structure of the Burnett Avenue joint venture appears to have remained rather inchoate until after actual acquisition of the Burnett Avenue lots occurred in May of 1981. It was not until some point subsequent to August of 1981 that Butticci, Atencio and Sheltered Financial constituted themselves the general partners of the Burnett Avenue Investment Fund, a limited partnership. The joint venture, which would be financed by the sale of limited partnership shares in the project, was comprised of this entity and HEMI. It is not clear just when the Burnett Avenue partnership achieved a formal existence, although it may be supposed that this occurred about the same time as the joint venture.
It seems fairly clear that three distinct entities were involved with the Burnett Avenue project. The first was the informal partnership comprised of Butticci, Atencio, Harris and the latter pair's corporate entities which was discernible during the period when the property and financing for the project were obtained. The second was the Burnett Avenue Investment Fund limited partnership. The third was the joint venture. For purposes of analytical simplicity and clarity, we shall telescope the first and second entities and incorporate them both within subsequent references to "the partnership."
[3] From May to December of 1981 Stickel received monthly payments of $2,600. From January through April of 1982 the payments were $2,816.67 (plus a single "late charge" of $64.67), reflecting the increase of the interest rate from 30 percent to 32.5 percent. Stickel received $600 in July of 1982 and $900 for the months of August, September, October and November of that year.
[4] Butticci and Atencio were also among the numerous other defendants named in the complaint. Butticci was subsequently adjudicated a bankrupt. A default judgment was entered against Atencio.
[5] The parties agree that section 1916.1, as originally adopted and as amended, is entitled to retroactive application to this case even though the transaction at issue occurred before the statute was enacted. (See Garcia v. Wetzel (1984) 159 Cal. App.3d 1093, 1096 [206 Cal. Rptr. 251]; Chapman v. Farr (1982) 132 Cal. App.3d 1021, 1023-1024 [183 Cal. Rptr. 606]; Orden v. Cranshaw Mortgage & Investment Co. (1980) 109 Cal. App.3d 141, 144-146 [167 Cal. Rptr. 62]; In re Lara (9th Cir.1984) 731 F.2d 1455, 1459; cf. Wolf v. Pacific Southwest etc. Corp. (1937) 10 Cal.2d 183, 184-185 [74 P.2d 263]; Penziner v. West American Finance Co. (1937) 10 Cal.2d 160, 170-178 [74 P.2d 252].)
[6] Business and Professions Code section 10131 provides in pertinent part: "A real estate broker ... is a person who, for a compensation or in expectation of compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:

"(a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity.
"(b) Leases or rents or offers to lease or rent, or places for rent, or solicits listings of places for rent, or solicits for prospective tenants, or negotiates the sale, purchase or exchanges of leases on real property, or on a business opportunity, or collects rents from real property, or improvements thereon, or from business opportunities.
"(c) Assists or offers to assist in filing an application for the purchase or lease of, or in locating or entering upon, lands owned by the state or federal government.
"(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity.
"(e) Sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract, or a promissory note secured directly or collaterally by a lien on real property or on a business opportunity, and performs services for the holders thereof."
[7] It is unclear whether a third requirement is that the broker be acting in a "licensed capacity," i.e., performing an act for which a license is required. (See In re Lara, supra, 731 F.2d 1455 at pp. 1458-1463; Winnett v. Roberts (1986) 179 Cal. App.3d 909, 919 [225 Cal. Rptr. 82]; Garcia v. Wetzel, supra, 159 Cal. App.3d 1093 at pp. 1099-1100 (dis. opn. of White, P.J.); Comment, The Usury Exemption: Should It Apply to Real Estate Brokers Making Loans?, supra, 26 Santa Clara L.Rev. 403, passim; Note, In re Lara: The Ninth Circuit Places Statutory Meaning in Doubt (1985) 15 Golden Gate L.Rev. 99, 109-112.) The substance of such a requirement is largely circuitous, if not casuistical, because acting in a licensed capacity is defined as acting for another for compensation. (See, e.g., Froid v. Fox, supra, 132 Cal. App.3d 832 at p. 839.)
[8] Butticci had dual status acting as he was as the agent of entities of which he would become a member. He was thus simultaneously agent and principal. A single person or entity can occupy both positions. (See Rest.2d Agency, § 14A, com. a, p. 62; 2A C.J.S. (1972) Agency, § 17, p. 580.) A broker may lose his or her status as an agent and be viewed exclusively as a principal if dealing with property owned jointly with a spouse. (See Robinson v. Murphy, supra, 96 Cal. App.3d 763 at p. 769.) Application of this rule may have formed the unarticulated reason the court in Winnett v. Roberts, supra, 179 Cal. App.3d 909, concluded that a loan negotiated by broker Don Winnett with respect to property owned by himself and Susan Winnett (presumably the broker's wife) was not arranged within the meaning of the usury law.

The trial court's legal conclusion that "Butticci was required... to have been a licensed broker to have solicited or negotiated the loans from Stickel" may be treated as encompassing a factual determination that Butticci's action were undertaken as an agent and not in his personal capacity as principal. (See McGaughey v. Fox (1979) 94 Cal. App.3d 645, 649-651 [156 Cal. Rptr. 593].)
[9] Butticci was also to receive a share of a "non-recur[ring] management fee" of $22,500. In light of our conclusion that Butticci's expectation of a share of the profits suffices as the requisite compensation, we express no view as to whether the same would be true with respect to this fee.
[10] Freely translated, "after this, therefore because of this."
[11] A licensee is subject to discipline if found to have made a usurious loan. (See Tushner v. Savage (1963) 219 Cal. App.2d 71, 77-80 [33 Cal. Rptr. 247].)
[12] Defendants' position may be illustrated with a concededly extreme and imperfect analogy. Suppose that an attorney working on a contingency fee basis is ultimately unsuccessful. According to defendants' reasoning, unless every single act performed for the client is rewarded with a separate compensation, the attorney would have to be treated as acting gratuitously and not as an attorney.
[13] This much is plain from the Legislative Counsel's digest for the bill (Sen. Bill No. 1105): "Under existing law, it is unlawful for any person to act as a real estate broker or salesperson without obtaining a real estate license. Existing law also provides specific exemptions from those provisions regarding a[c]ts relating to a person's own property. [¶] This bill would add an exemption for a general partner of a partnership dealing with partnership property, as specified." (Italics added.)
[14] Various authorities cited by defendants are clearly distinguishable and do not affect our conclusion. Froid v. Fox, supra, 132 Cal. App.3d 832, is not controlling because the broker there, in selling limited partnership interests in property which was never acquired, was acting solely for himself and was not performing acts for which a license was required. (Id. at pp. 841-842; see Booth v. Robinson (1983) 147 Cal. App.3d 371, 381 [195 Cal. Rptr. 130].) There could consequently be no question of the broker's acts being ratified by a principal, a circumstance of considerable importance in this case. The crucial fact in Robinson v. Murphy, supra, 96 Cal. App.3d 763, was not that the broker expected to realize a profit from the sale of real property, but that in contracting to pay his own company a commission from the sale of his own property, a commission which was never paid, the broker was neither acting for others nor expecting compensation from them. (Id. at pp. 767-768.) In In re Lara, supra, 731 F.2d 1455, Mr. and Mrs. Lara borrowed money from broker Zager and from a man named Pion who was himself not a broker but whose portion of the loan was solicited by Zager. The Ninth Circuit held that Pion's portion of the loan was not within the exemption of section 1916.1: "Zager claims that he was `compensated' for soliciting a lender inasmuch as he would not have undertaken the loan, and would have received no interest from the Laras, absent Pion's participation. The fact that Zager would profit if Pion agreed to undertake the loan, however, does not imply that Zager was acting for compensation." (Id. at p. 1463.) It is apparent that Zager received no form of tangible reward for his efforts. Zager, like the broker in Robinson, had no expectation of profit or benefit from another party independent of the interest obligation.
[15] We wish to compliment counsel for the unusually high quality of their written and oral presentations in this case.