[Civ. No. 17033.   Second Dist., Div. Three.   July 14, 1950.]

MYRON E. HYMAN, Appellant, v. EDWARD HYMAN, Respondent.

Fink, Rolston, Levinthal & Kent and Nelson Rosen, for Appellant.

Loeb & Loeb and Leon S. Alschuler for Respondent.

WOOD, J.—Appeal from a judgment of nonsuit. In the complaint it was alleged that the defendant owned and operated a business known as Edward Hyman Company, and in said business he manufactured clothing and engaged in the purchase and sale of real and personal property; on January 2, 1942, plaintiff and defendant entered into a written agreement whereby defendant agreed to pay to plaintiff in consideration of plaintiff's services in said business 20 per cent of the net profits of said business; plaintiff performed every service to be performed upon his part; while said agreement was in effect and during the year 1946, and in addition to sums for which defendant had accounted to plaintiff, the defendant realized a profit in said business of $786,043.85; defendant refused to pay to plaintiff 20 per cent of said sum or any part thereof; and the sum of $157,208.77 is unpaid.

Defendant, in his answer, admitted that he owned and operated a business known as Edward Hyman Company in which he manufactured work clothes, uniforms, sportswear, and linen supplies; admitted that he and plaintiff entered into a written agreement as follows:

"PROFIT SHARING AGREEMENT

"This Agreement, entered into January 2, 1942, by and

between Edward Hyman Co., party of the first part, and Myron E. Hyman, party of the second part.

"It is hereby agreed as follows:

1) That in consideration of the services to be rendered by Myron E. Hyman as manager of Edward Hyman Co., he shall receive 20% of the net profits and, in case of a loss, he shall absorb 20% of the loss from the operations of the Edward Hyman Co.

2) The net profit or loss shall be determined at the end of each fiscal year after the completion of the audit. The books shall be closed July 31st of each year and the account of Myron E. Hyman shall be credited or debited with his share of profit or loss as disclosed by the audit.

3) Cash drawn during the year by the party of the second part shall be considered an advance and shall be charged to his account.

4) This agreement may be terminated by either party without giving any written notice in advance.

> EDW. HYMAN
> MYRON HYMAN"

"Witness

> LEO D. EPSTEIN

Witness

> Edward Carroll"

Defendant, in his answer, denied all the other allegations of the complaint and denied that he was indebted to plaintiff in any sum.

Trial was by jury. Neither the reporter's transcript nor the minutes of the court, as set forth in the clerk's transcript, shows that plaintiff had closed his case. There is a recital in the judgment that "plaintiff closed." No point is made on appeal as to whether plaintiff had closed his case prior to the order granting defendant's motion for a nonsuit, and it will be assumed that plaintiff had closed his case.

The question is whether plaintiff presented any substantial issue of fact for the determination of the jury. In ruling upon a motion for a nonsuit the evidence must be viewed in the light most favorable to plaintiff.

Plaintiff is a nephew of defendant. He was employed by defendant in 1934 and he continued in such employment until August 14, 1946. About 1937 plaintiff became the manager of

defendant's branch factory in San Francisco, and he continued in that position until 1941. In 1941 defendant told plaintiff that if plaintiff would move to Los Angeles and become general manager of the entire business defendant would give him 20 per cent of the profits of the company provided plaintiff would share 20 per cent of the·losses, and that from the profits plaintiff could purchase a 20 per cent interest in the business. Plaintiff accepted the proposal, and he moved to Los Angeles and became general manager of the company, which then had factories in Los Angeles, San Francisco, Portland, and Atlanta, Georgia. The attorney for defendant prepared the written agreement, hereinabove quoted, and the defendant presented it to plaintiff. Defendant told him that the document was for the records because the accountant for the company had recommended that they have some evidence in writing as to the percentage plaintiff was drawing. Plaintiff said "[T]his was not our arrangements," and asked defendant "[W]hat happened to the 20 per cent partnership interest I was to get, or the right to purchase it?" Plaintiff said that he wanted to make the purchase of the 20 per cent interest and he wanted "what the arrangements were in San Francisco." Defendant said "When you have the money you can purchase it," and "You are getting the 20 per cent now any way." In the latter part of 1944 plaintiff told defendant he was ready to purchase the 20 per cent interest. Defendant said that he would let him know in a couple of days what he was going to do about it. A few days later defendant said "I have been advised I cannot give out a partnership interest in the business. I don't want you to be able to sell me out. I don't want you to be able to control me. You have got everything I have got in this business except that I will share it 80 per cent and you will share it 20 per cent." Defendant also said at that time something "about incorporating at some future date" and that plaintiff then might have the 20 per cent interest.

The company manufactured washable service apparel such as uniforms for doctors, nurses, grocery men, and waitresses; and it also manufactured work clothing such as shirts, coveralls, and shop coats. In addition to said manufacturing business the company "traded in some securities" and "bought several pieces of real estate."

Articles of incorporation of the Edward Hyman Company, a corporation, were filed in May, 1946, and the company was authorized to issue 360,000 shares of stock. On June 1, 1946,

the corporation made application to the corporation commissioner for a permit to issue 260,000 shares of stock to defendant in exchange for the assets, including the good will, of the business owned and operated by defendant under the fictitious firm name of Edward Hyman Company. The application was granted and on June 24, 1946, defendant executed a bill of sale which recited that he sold and conveyed to the corporation all the assets of the business conducted under the fictitious firm name of Edward Hyman Company, including the good will, trade marks, and trade names. After the said shares were issued to defendant the defendant asked plaintiff if he had the money for his 20 per cent of the stock (52,000 shares) at $5.00 per share, or $250,000. Plaintiff said that he did not have the money, and then he asked defendant where he got the $5.00 price. Defendant said that ''is what we're selling the stock for.'' Plaintiff asked him if he intended ''to make a profit off the good will on'' plaintiff; and plaintiff also said, ''What have I been doing all these years, and what about our original agreement?'' Defendant said he would think that over and let plaintiff know ''at what price we do come out at.'' Later defendant said he would not charge plaintiff for ''the profit of the good will,'' but the price at which the company was sold to the corporation was the price plaintiff would have to pay for his stock. Application was thereafter made to the corporation commissioner for a permit to issue 52,000 shares to plaintiff at $2.31 per share.

About August 12, 1946, when plaintiff returned from a vacation he was asked to sign minutes of the corporation which authorized certain persons to sign checks for the withdrawal of money from one of the bank accounts, but the plaintiff, who was the manager of the company, was not included as one of those persons so authorized. Plaintiff asked defendant about such authorization, and defendant said he forgot to include plaintiff's name. Plaintiff then (about April 14, 1946) decided to resign and not to buy the stock.

The earnings and profits increased while plaintiff was manager. During the 6 months prior to January 31, 1942, there was a profit of $22,558.78. During the 12 months prior to July 31, 1943, there was a profit of $99,264. During the 10 months prior to May 31, 1946, there was a profit of $300,199.20.

The fiscal year of the company ended on July 31st. Plaintiff admits that he has received his share of the profits for the fiscal years prior to July 31, 1945. Plaintiff does not contend

that he has not been paid 20 per cent of the profits which resulted from the manufacturing operations of the company. His complaint is based upon transactions of the company, other than manufacturing operations, which occurred in the fiscal year ending July 31, 1946.

Before the company was incorporated, certain property known as the La Casitas Apartments was treated, on the books of the company, as an investment in the operation of the company. In the application for a permit to issue stock, the property was listed as an investment of $19,000, but the property was not thereafter transferred to the corporation. The property cost $11,840 originally. The company received the rents from the apartments, and plaintiff received 20 per cent of the rents collected. After plaintiff left the company the apartments were sold and defendant sent a check to plaintiff for $1,208.77 and told plaintiff that the check represented 20 per cent of the profits on the sale of the apartments. On the back of the check there was writing as follows: "In full payment of all obligations and indebtedness by Edward Hyman, Edward Hyman Company, Edward Hyman Company Corporation to December 12, 1946." Plaintiff did not present the check for payment. Defendant testified, in effect, that the check was a gift.

In May, 1945, the company purchased 7,125 shares of stock of the Galland Linen Supply Company for $26,250. In December, 1945, certain shares of the stock were sold at a profit, and plaintiff was paid 20 per cent of the profit. In January, 1946, other shares were sold at a profit, and plaintiff was paid 20 per cent thereof. The cost of the remainder of the stock was $24,776.25. In April, 1946, the remainder of that stock was withdrawn by defendant from the company, and at that time it was valued at $54,600.

On April 26, 1946, prior to incorporation of the company, the books of the company (as shown by a financial statement of that date) showed the net worth of the machinery, equipment, buildings and land of the company (at 1830 South Hill Street, Los Angeles) to be $597,392.74. That amount was $204,319.91 more than the cost of those assets as shown by the books. The said net worth, as shown by the books, did not include the value of the good will, trade marks, or trade names; nor did it include certain shares of stock of the Galland Linen Supply Company which had been carried on the books of the company. The financial statement, above re-

ferred to, was submitted to the corporation commissioner as a part of the application for a permit to issue stock.

Plaintiff contended at the trial that the transfer by defendant of the assets of the company (doing business under a fictitious name) to the corporation in consideration of the issuance of stock to the defendant was a sale, and that a profit resulted therefrom. There was evidence as to the appraised value and book value of those items prior to the transfer. In the application for a permit to issue stock the value of those items was stated, and that value was greatly in excess of the former appraised value and the book value. Defendant contended at the trial that a transfer of those assets was a "tax-free transfer" and that defendant did not realize a profit from the transaction. Plaintiff asserts that it is immaterial in this case as to what the federal or state government determines to be gains for purposes of fixing income tax; and that a determination for income tax purposes is not conclusive as to the rights and liabilities of the parties under their contract.

The machinery and equipment transferred by defendant to the corporation for stock issued to himself was not transferred at the original cost thereof but, according to testimony of an accountant, there was a profit from an accounting standpoint in the amount of $81,030.10, and that amount was entered on the books as "Appreciation of assets by appraisal, $81,030.10." Plaintiff had been charged 20 per cent of the depreciation on these items during the period from 1942 to 1946.

There was a conflict in the evidence as to whether the building and land (1830 South Hill Street, Los Angeles), where the main office was located, were transferred to the corporation. The cost of those assets was about $57,000. In the application for a permit to issue stock it was stated that those assets were of the value of $177,648.05. If those assets were transferred to the corporation, then plaintiff asserts that defendant realized a profit from the transfer. If those assets were not transferred to the corporation, plaintiff asserts that there is justifiable ground for plaintiff to claim 20 per cent on the gain reflected upon the books of the company by reason of the increase in value of the building and land. Plaintiff had been charged 20 per cent of the depreciation, the expenses, and the interest paid on a mortgage, in connection with those assets during the period from 1942 to 1946.

The good will of the company (operating under a fictitious name) was transferred by the defendant to the corporation.

As above shown, the business increased greatly while plaintiff was manager. Plaintiff asserts that the value of the good will also increased greatly during that time; that the shares of stock issued to defendant by the corporation represented payment for the good will of the business in addition to the physical assets transferred to the corporation. The defendant testified that the good will of the business had value on the day he gave the bill of sale to the corporation. He asked plaintiff to pay $5.00 per share for the stock. He testified that in August and September, 1946, shares of stock (about 17,000 shares) were sold for $4.50 per share. When plaintiff objected to paying $5.00 per share for the stock and stated that defendant should not make "a profit off the good will on" plaintiff, the defendant said: "Well, I'll think about the good will involved, but those assets, I am entitled to a profit on those." Plaintiff argues that the jury could have found that the 260,-000 shares of stock received by defendant were worth $4.50 per share or $1,170,000, and that the difference between that amount and the value of the physical assets, $597,392.74, constituted the value of the good will. He argues further that, although the value of the good will could not be determined with mathematical certainty, it was a question of fact for the jury as to the value of the good will when plaintiff became the manager and when the good will was transferred to the corporation; and that the increase in the value of the good will was a profit from "the operations of the Edward Hyman Co.," and that the jury would have been justified in finding that plaintiff was entitled to 20 per cent of the increase in value of the good will.

One question of fact for the determination of the jury was whether the word "operations" in the expression "from the operations of the Edward Hyman Co.," used in the contract, included transactions of the company other than manufacturing operations. The company, according to its books and the testimony of plaintiff, did engage in business other than manufacturing washable service apparel. It cannot be determined, as a matter of law, from the contract itself that the "operations" referred to were solely the manufacturing and sales of merchandise. The conduct of the parties in performing the agreement, before the controversy arose, is an important factor to be considered in determining the understanding and intention of the parties in the use of those words. As above shown, there was evidence that plaintiff did receive 20 per cent of the profits from transactions other than those of

manufacturing and selling merchandise, and that he was charged 20 per cent of the loss, depreciation and expenses in transactions other than the manufacturing operations. In *Nelson* v. *Abraham,* 29 Cal.2d 745 [177 P.2d 931], plaintiff and defendant entered into an oral agreement which provided that if plaintiff would conduct the branch office of defendant's ice business in San Francisco he would receive one-third of the net profits from the operation of the business but would not have an interest therein. After plaintiff therein had conducted the business for a while it was sold by defendant, without notice to plaintiff, at a profit of $5,000. Plaintiff therein alleged a copartnership and the existence of a net profit from the operation of the business and from the sale of assets, and sought an accounting. The trial court found that a copartnership did not exist and that plaintiff was not entitled to any part of the profits from the operation or sale of the business. The judgment was reversed. The court said at page 749: ''The question may not be dismissed summarily with the observation that, since the agreement gave the plaintiff a share of the net profits from operation without an interest in the business, and since the books showed no net profit from operation, the plaintiff has furnished no basis for an accounting.'' It was also said therein, page 750: ''Whether the agreement to share profits is merely to provide a measure of compensation for services . . . or whether it extends beyond and bestows ownership and interest in the profits themselves so as to constitute the undertaking a partnership or a joint venture, presents primarily questions of fact. . . . It has been said to be a 'mingled problem of law and fact.' . . . It is, however, unnecessary to place a precise legal designation on the relationship between the parties. . . . The oral agreement and the conduct of the parties thereunder, considering the nature of the undertaking and the surrounding circumstances, define their respective rights, liabilities and duties one to the other without the necessity for designating their relationship by a particular label.'' It was also said therein, page 751: ''It is conceivable that the relationship between parties may be, for one purpose, that of employer and employee, while for another, that of partners or joint adventurers.'' It was also said therein, page 753: ''[I]n any accounting under the agreement, the court may consider what the parties meant by 'profits from operation' of the San Francisco business. This is so for the reason that there existed between them an agree-

ment to share those profits. . . . The plaintiff is entitled to his portion of the profits under the agreement established by the record. . . . Therefore, upon proper consideration of all relevant facts, there might appear justification for viewing the San Francisco venture as an 'operation,' and for concluding that any other sense of that word would render the parties' agreement meaningless.''

Other questions of fact in the present case for the determination of the jury were: (1) whether the La Casitas Apartments transaction was an operation of the company; (2) whether the check for $1,208.77, which defendant sent to plaintiff, represented 20 per cent of the profit from the sale of those apartments or whether it was a gift from defendant; (3) whether the Galland Linen Supply Company transaction was an operation of the company, and what amount, if any, was due to plaintiff from that transaction; (4) whether a profit resulted from the transfer of the assets to the corporation, and what amount, if any, was due to plaintiff by reason of the transfer. We do not hold, however, that there may not be other questions of fact for the court or a jury.

The judgment of nonsuit, and the minute order granting the motion for a nonsuit, are reversed.

Shinn, P. J., and Vallée, J., concurred.