[No. B003449. Second Dist., Div. Four. Sept. 22, 1988.]

GEORGE F. GERARD, Plaintiff and Appellant, v.
EDWARD M. ROSS et al., Defendants and Appellants.

COUNSEL

Paul M. Hittelman for Plaintiff and Appellant.

John F. Harris, Horvitz, Levy & Amerian, Ellis J. Horvitz, Grant Marylander, Frederic D. Cohen, S. Thomas Todd and Michael R. Tyler for Defendants and Appellants.

OPINION

**GOERTZEN, J.**—This appeal has been preceded by a trial for libel, consolidating two complaints; a trial for malicious prosecution; an appeal, resulting in an August 21, 1978, opinion by Ashby, J., Hastings, J., and Kaus, J.; and a second trial for malicious prosecution. All parties appeal from the judgment.

### UNDERLYING FACTS

George Gerard (Gerard) has been a resident of Inglewood since 1962. In 1968, he became interested in local politics; his involvement increased in July 1969, when Inglewood formed a redevelopment agency and his friend, the planning director, was fired. At that time he formed the Inglewood Citizens Committee to raise funds for his fired friend. As a self-described

"clean government nut," Gerard kept close watch on the Inglewood City Council, of which David C. Pierson (Pierson) was a member.[1] He attended numerous city council meetings, speaking vigorously on a wide variety of issues. In addition to complaining to the district attorney's office about the handling of a zoning matter, Gerard also filed several suits against the city, challenging the validity of various council actions.

In February 1970, Gerard actively campaigned against the election of Pierson to the state Assembly. After Pierson was elected, Gerard opposed Robert M. Letteau (Letteau) when he ran for the city council vacancy created by Pierson's election to the Assembly. The president/publisher of the Inglewood Daily News, Edwin W. Dean, Jr. (Dean), supported Letteau's election, and the Inglewood Daily News endorsed him. The night Letteau was elected, Gerard told Edward M. Ross (Ross) that Letteau's election was going to be challenged based on Letteau's residency outside Inglewood.

To that end, Gerard held a meeting at his home on April 22, 1971, formed the Citizens Committee for Honest Elections (the committee), and hired an attorney to mount the challenge. Gerard prepared a press release, dated April 23, 1971, about the formation of the committee. He delivered it to the Inglewood Daily News, the South Bay Daily Breeze, and the Los Angeles Times. The Daily Breeze printed the press release information on April 25, 1971. The Los Angeles Times likewise did so about seven to ten days after the press release was issued. On either April 28 or 29, Gerard called Louise Anderson, editor of the Inglewood Daily News, to inquire about the printing of his press release.[2] He was informed by Ms. Anderson that the press release had not been published because it had not named the councilman who was the subject of challenge.

Gerard prepared and printed 1,000 copies of a fundraising letter for the committee; it was dated April 29, 1971, and was signed by the committee officers. This letter contained the following statement: "[T]he South Bay Daily Breeze on Sunday, April 25th, reported the formation of the Citizens Committee for Honest Elections. . . . Ed Dean chose to keep this Inglewood news from his subscribers." By this statement, Gerard intended to imply that "if a genuinely-interested citizen of Inglewood wished to know what was going on in the community, he would have to read more than one newspaper" and that "from time to time Mr. Dean reported the news

---

[1] Pierson was the law partner of Edward M. Ross and Robert M. Letteau in the law firm of Ross, Pierson & Letteau, a professional corporation (the law firm).

[2] The law firm represented both the Inglewood Daily News and Dean. Dean was a friend of Ross, Pierson and Letteau and supported both Pierson and Letteau in their respective elections.

selectively. . . ." However, Gerard had made no effort to ascertain whether Dean, in fact, had taken a personal part in the decision not to publish the press release. Copies of this letter were distributed citywide, by hand and mail over a period of two to three weeks.

On May 7, 1971, the Inglewood Daily News published an article about the complaint filed by the committee, challenging Letteau's election. Despite having seen this article, Gerard continued to distribute the fundraising letter.

Around May 13, Dean saw the fundraising letter when his mother brought him a copy which she had received. At that time, Dean was unaware that the Inglewood Daily News had received Gerard's press release. He called Ms. Anderson, the editor who covered developments in city government and whose responsibility it was to make such decisions. She explained that because Gerard had chosen not to respond to her specific query regarding the identity of the councilman being challenged, she had decided not to publish the press release.

Believing his professional reputation was being attacked, shortly thereafter Dean met with Ross, Letteau and Pierson in their law offices to discuss whether the contents of the fundraising letter were libelous and actionable. Upon arriving at the law office, the attorney with whom Dean had made the appointment was unavailable. Consequently, he went into Letteau's office to chat. Pierson and Ross joined Dean in Letteau's office. Letteau hardly participated in the discussions. Ross was the principal attorney to whom Dean related his complaints. After a one and one-half hour meeting, the consensus was that the letter was libelous, and Dean retained Letteau, Ross and Pierson to represent him and file suit.[3] To Dean, the point of filing the suit was "to make [Gerard] stop and think a little bit, to pull him up short when he did this sort of thing." This intended result was discussed at the meeting. In Ross's professional opinion, Gerard's fundraising letter communicated that Dean was making a deliberate choice not to print Gerard's press release; and the letter was false for two reasons: (1) Dean had not made any such decision; and (2) the Inglewood Daily News had printed a story about the formation of the committee.

Ross testified that after this meeting, he conducted legal research on the possible defenses to a libel action, the interested party and public figure privileges. He also considered factual arguments which would negate application of these privileges.

---

[3] There was conflicting evidence on this point. During his deposition, Ross had testified that there was a consensus at the meeting that the words were actionable; at trial, Ross testified that there was a consensus that the words were libelous, but not necessarily actionable.

The complaint for libel was filed on June 10, 1971; it was served on Gerard by Mrs. Letteau in the city council chambers after the formal proceedings had terminated. Gerard felt "dismayed, flabbergasted, [and] angry," and with eight to ten people within earshot, he engaged in a verbal exchange with Letteau who was also present.

In 1972, Pierson's assembly seat was up for reelection. Gerard decided to challenge Pierson's reelection on the ground that Pierson did not live in the district. Gerard prepared a packet of materials attacking Pierson and, in March 1972, he distributed them to 78 state assembly members, members of the state executive branch, 76 newspapers, and several radio and television stations. Included within this packet was the fundraising letter Gerard had earlier distributed with the statement about Dean's decision not to publish Gerard's press release.

Because Gerard did not send one to Pierson, Pierson received a copy of this packet from another assembly member. Pierson sent copies to Dean and Ross. Ross believed that this second publication of the offending letter made for a stronger case of libel than the original distribution. With Dean's permission, a second suit was filed on April 10, 1972.

## PROCEDURAL HISTORY

Dean's two libel complaints were consolidated for trial in 1973.[4] A judgment of nonsuit was entered in Gerard's favor. In June 1974, Gerard filed a malicious prosecution and conspiracy action against Ross; Pierson; Letteau; and Ross, Pierson & Letteau, a professional corporation.[5] Gerard contended that the attorneys had filed the libel suits in furtherance of a conspiracy to preclude him from "freely . . . express[ing] himself on matters of important public interest. . . ."

This action proceeded to trial, and the trial court granted the defendants' motion for nonsuit, holding that Gerard "had produced no substantial evidence to go to the jury on the issues of conspiracy, malice or lack of probable cause." Gerard appealed this judgment, and, in a nonpublished opinion, Division Five of this court reversed the judgment.

The matter was retried in September 1982. Before trial commenced, the court ruled that the appellate decision required it to grant defendants' motion that "no evidence, testimony, argument or reference going to the

---

[4] Because Ross was to be out of the country, the law firm did not try the case; with the help of Pierson, Ross arranged for another firm to do so.

[5] Dean and the Inglewood Daily News, Inc., were also defendants in the malicious prosecution suit. However, neither is a party to this appeal.

issue of conspiracy be allowed." Upon completion of Gerard's case-in-chief, the court granted Letteau's motion for nonsuit. Thereafter, the case was submitted to the jury, and the jury returned its special verdict, finding that Ross and the law firm had committed malicious prosecution and awarding special damages for attorney's fees and costs of defending the prior actions in the sum of $4,314.70 plus 6 percent, totalling $8,200; no general damages; and punitive damages of $50,000 against Ross and $100,000 against the law firm. The jury also found that Pierson had not committed malicious prosecution.

With the exception of Pierson and Letteau, each party filed posttrial motions. The court denied Gerard's motions; granted the law firm's motion for judgment notwithstanding the verdict; conditionally granted Ross's motion for a new trial unless Gerard would accept a remittitur of the punitive damages against Ross to $25,000; and granted the defendants' motion to tax costs, disallowing cost items aggregating $3,520.90. Gerard accepted the remittitur.

## ISSUES ON APPEAL

Gerard appeals, contending the trial court prejudicially erred when it (1) conditionally granted Ross's motion for new trial; (2) granted judgment notwithstanding the verdict in favor of the law firm; (3) granted Letteau's motion for nonsuit; (4) eliminated the conspiracy issues from the case; (5) refused some of Gerard's requested jury instructions; and (6) granted defendants' motion to tax costs. He also asserts that (7) the jury award of special damages is inadequate; and (8) that there is no substantial evidence to support the jury's verdict in favor of Pierson.

Ross, Pierson, Letteau and the law firm appeal, asserting that (1) the trial court prejudicially erred when it allowed the jury to decide what constituted probable cause to file the libel suits; (2) Gerard's failure to produce expert testimony regarding probable cause requires reversal; (3) the jury erroneously was instructed; (4) the punitive damages awarded against the law corporation were excessive as a matter of law; and (5) the jury's award of damages for past inflation is unsupported by substantial evidence.

## GERARD'S APPEAL

*The Motion for New Trial*

██ ██ ██ Gerard contends that the trial court failed to state sufficiently specific reasons for granting Ross's motion for new trial as

required by Code of Civil Procedure sections 657 and 662.5.[6] In addition, Gerard argues that the reasons given by the court are either inadequate as a matter of law or not supported by the record.[7]

■ When a trial court's action " 'granting a new trial on the ground of excessive damages, or requiring a reduction of the amount as the condition of denying one, comes to be reviewed on appeal, [the trial court's] order will not be reversed unless it plainly appears that [it] abused [its] discretion. . . .' " (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 932-933 [148 Cal.Rptr. 389, 582 P.2d 980].)" ■ When a motion for new trial is granted on the ground of excessive damages, the order should specify the evidence which required a smaller verdict. (*Id.,* at p. 932.) This requirement of a specification of reason serves the two-fold purpose of encouraging careful deliberation by the trial court before ruling on a motion for new trial, and of making a record sufficiently precise to permit meaningful appellate review. (*Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 363 [90 Cal.Rptr. 592, 475 P.2d 864].) ■ However, "somewhat different considerations apply when . . . it is the amount of *punitive* damages awarded which is the primary concern." (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 932, italics in original.) In such cases, the specification is adequate when "it makes reference to those aspects of the trial proceedings which, in the trial court's view, improperly led the jury to inflate its award." (*Ibid.*) "So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside. [Citations.]" (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d

---

[6] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

The court's order on the motion, in pertinent part, provided: "1. Motion of defendant, Edward M. Ross, is conditionally granted only as to the issue of punitive damages but, if plaintiff consents to the reduction of punitive damages from $50,000 to $25,000 by filing a consent to remittitur within thirty days from December 8, 1982, the Motion will be denied. [¶] 2. The ground upon which this Order is based is the fact that the punitive damages awarded to plaintiff, George F. Gerard, by jury verdict in the sum of $50,000 is excessive based upon the evidence. [¶] The reasons for granting the Motion are: [¶] 1. The award of punitive damages does not bear a reasonable relationship to the award of compensatory damages. [¶] 2. The award of punitive damages does not bear a reasonable relationship to the value of the total assets of the defendant, Edward M. Ross. [¶] 3. The award of punitive damages does not bear a reasonable relationship to the annual income of defendant, Edward M. Ross. [¶] 4. The award of punitive damages by the jury was confiscatory in nature."

[7] In his reply brief, Gerard also argues that reversal is required because the court failed to include in its written specification of reasons a finding that it had reviewed the entire record, including reasonable inferences therefrom, and concluded the jury should have reached a different verdict. While this exact language is missing from the written specification of reasons, the record reveals that the court used the proper standard when it exercised its discretion. When ruling at the hearing on this matter the court stated, "And after reweighing the evidence, I'm convinced from the entire record, including the reasonable inferences from it, that the jury awarded an excessive amount of punitive damages." We are satisfied the court applied the proper standard.

379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92].) In addition, section 657 provides that an order granting a new trial on the ground of excessive damages "shall be reversed as to such ground only if there is no substantial basis in the record for *any* of such reasons." (Italics added.) The same rule applies when a conditional order under section 662.5 had been granted. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 933.)

Applying these standards to the instant case, we find that the court's specification of reasons for conditionally granting a new trial, quoted *ante* in footnote 6, is adequate. *Neal* allows for wider latitude when, as here, the new trial is limited to the issue of punitive damages. As section 657 requires affirmance if any one of the court's reasons has substantial support in the record and due deference is given the court's determination, we find that the court's second and third reasons satisfy both the section 657 and *Neal* requirements.

Here, the trial court independently reviewed the facts and determined that $25,000 was sufficient to accomplish the purpose of punitive damages, which in this case was to deter attorneys (and Ross, specifically) from filing suits that result in a subsequent malicious prosecution action. Evidence had been offered that Ross was no longer in private practice as an attorney; in 1981 he had been appointed to the superior court and had an annual salary in the range of $63,200 at the time of trial. He also received between $3,000 and $3,600 a year from the Naval Reserve and between $700 to $3,000 annually as a member of a corporation's board of directors. Ross had estimated his net worth at approximately $450,000. The $50,000 punitive damages award represented over 70 percent of Ross's gross annual income, and 11 percent of his net worth.

The court's action, based on its analysis of these facts, is not an abuse of its discretion. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910.)

*Judgment Notwithstanding the Verdict (JNOV) in Favor of the Law Firm*

■ By special verdict, the jury found that the law corporation had committed malicious prosecution and awarded $100,000 punitive damages against it. After the jury entered its verdict, the law firm and Ross filed a motion for JNOV, new trial, remittitur and a stay of execution. When arguing that the punitive damage award against the law firm was excessive, the defendants pointed out that the $100,000 award represented 100 percent of the law firm's worth; and that the law firm was now solely owned by Pierson, the one defendant found not to have committed malicious prosecution.

When the court ruled on the law firm's motion, however, it made no reference to the excessiveness of the award. Instead, it granted JNOV as to the law firm and found that "disregarding conflicting evidence on the defendants' behalf and giving plaintiff's evidence all of the value to which it is legally entitled and indulging in every legitimate inference that may be drawn from that evidence . . . there was no substantial, sufficient substantial evidence to support the judgment against the professional corporation. . . ."

This finding is puzzling as the court's very next ruling denied Ross's motion for JNOV. The record indicates that the idea that the law firm could be found liable for malicious prosecution as a result of the acts and conduct of its principal, shareholder, director and employee, Ross, was unchallenged throughout the trial. In fact, the court charged the jury with an unnumbered instruction, which provided: "It is established that Edward M. Ross and David Pierson were the agents of defendant Little, Ross & Pierson, aka Ross, Pierson & Letteau, a professional corporation. Therefore, any act or omission of Ross or Pierson was in law the act or omission of said professional corporation defendant." Hence, we conclude the court erred when it found no substantial evidence existed to support the judgment against the law firm.[8]

■ This conclusion requires the reinstatement of the $100,000 punitive damage award against the law firm. It is well established that a reviewing court should examine punitive damages and, where appropriate, modify the amount in order to do justice. (*Allard* v. *Church of Scientology* (1976) 58 Cal.App.3d 439, 453 [129 Cal.Rptr. 797].) This is especially suitable where, as here, the punitive damages are "palpably excessive or grossly disproportionate. . . ." (*Burnett* v. *National Enquirer, Inc.* (1983) 144 Cal.App.3d 991, 1011 [193 Cal.Rptr. 206, 49 A.L.R.4th 1125].) The uncontroverted evidence was that the law firm had a net worth of $100,000 and an annual net income between $90,000 and $150,000. Thus, the jury's $100,000 award against the law firm represented 100 percent of its net worth and between 66 percent and 111 percent of its net annual income. This result is a clear indication that the jury misunderstood the purpose of punitive damages and/or acted out of passion or prejudice. While it was found that the firm was chargeable with Ross's actions, in light of the minimal net worth of the corporation and the severance of the relationship between the corporation on the one hand and Letteau and Ross on the other, $100,000 punitive damage award was excessive as a matter of law and is hereby reduced to $1,000.

---

[8]Below, we discuss and reject Ross's assertion that there is no substantial evidence to support the jury's verdict against him.

*The Motion for Nonsuit as to Letteau*

■■ As noted above, at the conclusion of Gerard's case-in-chief, the court granted Letteau's motion for nonsuit. On appeal from a judgment of nonsuit in favor of defendant at close of plaintiff's case, the question is whether plaintiff presented any substantial issue of fact for the determination of the jury, giving plaintiff's evidence all the value to which it is legally entitled and indulging in every legitimate inference which may be drawn from that evidence. Moreover, the evidence must be viewed in the light most favorable to plaintiff. (*Hyman* v. *Hyman* (1950) 98 Cal.App.2d 463, 465 [220 P.2d 623].) It is not necessary, however, that there be an absence of conflict in evidence before the trial court may exercise its power to grant a nonsuit; there must be a substantial conflict in evidence to deprive the court of this power. (*Campbell* v. *Security Pac. Nat. Bank* (1976) 62 Cal.App.3d 379, 385 [133 Cal.Rptr. 77].)

In the instant case, the evidence was uncontroverted that Letteau had even less involvement with the filing of the libel suits than Pierson, who was found not liable by the jury. The extent of Letteau's involvement with the suits was his presence at the initial meeting between Ross and Dean. His presence at this meeting was prompted by Ross's late arrival. Both Ross and Letteau testified that Letteau's participation in the meeting was minimal; when Ross arrived and discussions about the case began in earnest, Letteau occupied himself with other work and made some phone calls. Letteau testified that he may have met with another client in the firm conference room while the discussions continued in his office. He undertook no additional work on the case. After the decision to sue had been made by Ross and Dean, Letteau's wife served the complaint on Gerard. Letteau had no involvement in the second libel suit.

The elements of a cause of action for malicious prosecution are that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in the plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) The evidence of Letteau's involvement simply does not contain facts to support the finding of these elements. The trial court correctly concluded that this minimal evidence was an insufficient basis upon which to fasten a jury verdict of malicious prosecution.

*The Conspiracy Issues*

■ Before commencement of trial, the court ruled that "the law of the case," as defined in the prior appellate court opinion, required the exclusion

of any "evidence, testimony, argument or reference going to the issue of conspiracy." Gerard objects, arguing that there was no "law of the case" because the appellate court had reversed the entire judgment, not just that portion which dealt with the malicious prosecution cause of action.

Our reading of the appellate court opinion reveals that the appellant (Gerard) had argued that the nonsuit should be reversed because the trial court had applied an incorrect standard. The appellate court rejected this contention and quoted the trial court's comment, which indicated that the trial court had, in fact, applied the proper standard when it found that the plaintiff had failed to sustain his burden in proving there was a conspiracy. Consequently, the court found unpersuasive Gerard's contention that the trial court misunderstood the standard to be used. The remainder of the opinion is comprised of a discussion concerning the various elements which constitute malicious prosecution. The opinion ends with the following: "Applying the strict standard of review applicable to nonsuits, we conclude the trial court erred in refusing to permit this case to go to the jury. [¶] The judgment is reversed."

We need not determine whether there is merit to Gerard's contention that there was no "law of the case," and that, therefore, the trial court erred because Gerard's counsel invited this error. Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal. (*Morris* v. *Frudenfeld* (1982) 135 Cal.App.3d 23, 32 [185 Cal.Rptr. 76].) Here, defendants moved *in limine* at the second trial to exclude all evidence, argument and instructions relating to Gerard's conspiracy claim on the basis of the appellate opinion. At oral argument, the court inquired of Gerard's counsel whether he had "[a]ny opposition to the granting of that motion?" He answered: "Your Honor, my only opposition is this: Evidence we would offer that would bear on the issue of conspiracy will be identical to the evidence that we would offer on other issues in the case." The court responded: "Fine. Just don't use the word, 'conspiracy.'" Whereupon, counsel concurred. This record supports a conclusion that the "error" of which Gerard complains was invited by counsel.

*Jury Instructions*

Gerard requested that the jury be charged with his proposed instructions 53 and 54, dealing with the liability of one who aids, abets or continues the malicious prosecution of a civil action instituted by another.[9]

---

[9] Plaintiff's requested instruction number 53 provided: "Any person who aids and abets the malicious prosecution of a civil action which someone else has instituted, even if he had no part in the commencement of the action, may have liability imposed against him for such malicious prosecution."

These instructions were proffered in an effort to attach liability to Pierson. Gerard's contention that the trial court's refusal of these instructions was prejudicial error is without merit. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

In the civil arena, an aider and abettor is called a cotortfeasor. To be held liable as a cotortfeasor, a defendant must have knowledge and intent. Instructions number 53 and 54, quoted below in footnote 9, misstate the law because they omit these two essential elements. A defendant can be held liable as a cotortfeasor on the basis of acting in concert only if he or she knew that a tort had been, or was to be, committed, and acted with the intent of facilitating the commission of that tort. (*Orser* v. *George* (1967) 252 Cal.App.2d 660, 667 [60 Cal.Rptr. 708].) Gerard's instructions were incomplete; consequently, the trial court's refusal was appropriate.

*Motion to Tax Costs*

■■■ In granting the defendants' motion to tax costs, the trial court disallowed the following charges incurred by Gerard in the prior trial: the Court of Appeal filing fee; reporters' fees for transcript of the 1973 libel trial; reporters' fees for transcript of the 1976 malicious prosecution trial; and jury fees for 1976 trial, all of which totalled $3,520.90. Gerard asserts the court erred in striking these items because they were "necessarily incurred in the action or proceeding" as required by section 1033.

Gerard's factual basis for this argument is deficient. He omits the reason the court disallowed these costs. Our review of the record indicates the court did so because Gerard failed to file timely memoranda of costs. The decision whether a party has waived costs by virtue of a late filing is left to the sound discretion of the trial court. (*Hoover Community Hotel Development Corp.* v. *Thomson* (1985) 168 Cal.App.3d 485, 487-488 [214 Cal.Rptr. 264].)

The opinion in the first appeal of this matter was filed on August 21, 1978, and the remittitur was filed shortly thereafter. Section 1034 then required a memorandum of costs to be filed within 30 days of the issuance of the remittitur. Gerard failed to file his memorandum within the time required and six months later (Feb. 1979) sought leave to file a late memorandum of costs. The trial court denied his request.

After the second trial, Gerard failed to file a timely memorandum of costs. Again, he sought leave to file a late memorandum. Additionally, he

---

Plaintiff's requested instruction number 54 provided: "The continuation of a malicious prosecution beyond the initial act of instigation may inflict additional damage upon the victim."

filed a memorandum of costs in which he again sought to recover the costs for the first trial and appeal. The court allowed costs for the second trial, but disallowed costs for the first trial and appeal. These facts do not support a holding that the trial court abused its discretion when it determined that Gerard had waived costs.

*Special Damages Award*

The jury responded to the query: "What is the total amount of damages you award to reasonably compensate plaintiff for his expense, including attorneys' fees, paid by him in successfully defending against the prior actions?" by awarding Gerard $4,314.70, plus 6 percent, which the jury determined totalled $8,200. Gerard contends that the uncontested evidence reflected expenditures amounting to $5,314.70 and requests that we increase the award by $1,000 plus 6 percent interest.

Section 662.5 grants the trial court discretion to exercise its additur powers to determine, upon its review of the entire record, an addition which is fair and reasonable. The Law Revision Commission comment on this section states that: "The exercise of additur authority . . . is limited to cases where 'an order granting a new trial limited to the issue of damages would . . . be proper.' This limitation prevents the use of additur where the inadequate damages are the result of a compromise on liability."

We will disturb a trial court's refusal to exercise its additur power only if the record reveals an abuse of discretion. Gerard points us solely to the fact that the jury's award of compensatory damages was exactly $1,000 less that the amount Gerard's testimony identified. Without more, this is an insufficient fact upon which to base a conclusion that the trial court abused its discretion.

*Substantial Evidence and the Jury's Verdict in Favor of Pierson*

Lastly, Gerard challenges the sufficiency of the evidence supporting the jury's determination that Pierson did not commit malicious prosecution. "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached. . . ." (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) *"If such substantial evidence be found, it is of no consequence that the [trier of fact] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.* [Citations.]" (*Bowers*

v. *Bernards* (1984) 150 Cal.App.3d 870, 874 [197 Cal.Rptr. 925]; italics in original.)

The evidence at trial revealed that Pierson's only connection with the first action was his attendance at part of the initial meeting between Ross and Dean. His only connection with the second action was forwarding the packet of materials Gerard had sent to assembly members, the Governor and other executive officials, which included the committee fundraising letter. Finally, he helped Ross find associate counsel to try the actions after they had been consolidated, and helped "accommodat[e] an orderly transmission of the files and the materials to [that counsel's] office." The lack of any legally meaningful involvement with the actions supports the jury's verdict exonerating him.

### THE ROSS/LETTEAU/PIERSON & LAW FIRM APPEAL

*Probable Cause to File the Law Suit*

■ As noted above, "[t]o establish a cause of action for the malicious prosecution of a civil proceeding, a plaintiff must plead and prove that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice. [Citations.]" (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 50.) "An attorney has probable cause to represent a client in litigation when, after a reasonable investigation and industrious search of legal authority, he has an honest belief that his client's claim is tenable in the forum in which it is to be tried. [Citations.] The test is twofold. The attorney must entertain a subjective belief in that the claim merits litigation and that belief must satisfy an objective standard." (*Tool Research & Engineering Corp.* v. *Henigson* (1975) 46 Cal.App.3d 675, 683 [120 Cal.Rptr. 291].)

■ In determining whether the requisite probable cause exists, "[t]he trier of fact must resolve any conflict in the evidentiary underpinning of the facts of probable cause. Once that conflict has been resolved, the question of whether the facts as they are found to exist constitute probable cause for bringing the former action is a question of law to be resolved by the judge. [Citations.]" (*Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d at p. 682.)

Ross, Letteau, Pierson and the law firm (collectively, as Ross) aver that in contravention of this body of law, the trial court instructed the jury to resolve the legal issue of probable cause. Specifically, Ross objects to the

plaintiff's requested jury instruction No. 32.[10] Citing language from *Williams* v. *Coombs* (1986) 179 Cal.App.3d 626, 638 [224 Cal.Rptr. 865], an opinion written four years after this trial, Ross contends that whether an attorney/defendant's investigation and research was reasonable is part of the legal element of probable cause which is to be determined by the court. He contends that instruction 32, quoted below in footnote 10, charges the jury with this determination.[11]

■ When it is argued that a jury has been erroneously instructed, we examine "all the circumstances of the case including a review of all of the evidence as well as the instructions as a whole. [Citations.]" (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 59.) A review of the instructions, as a whole, reveals that no prejudicial error was committed.

In addition to instruction number 32, the court also instructed the jury with instruction number 41/42.[12] This instruction, quoted below in footnote 12, like number 32, does not instruct the jury to determine whether proba-

[10] This instruction provided: "In order for defendants herein to have had probable cause for the institution and maintenance of the prior actions, you must find that the defendants, after a reasonable investigation of the facts and a reasonable search of the law had a reasonable, honest good faith belief that their client's claim was a tenable one as to each of the following facts. [¶] 1. That plaintiff in fact sent Plaintiff's Exhibit 3 [the committee fundraising letter] with actual malice to persons not interested in the subject thereof or not to persons who, by reason of the relationship to plaintiff, had reasonable grounds to suppose that his motives in sending the communication were innocent; [¶] 2. That the statements concerning the defendants' clients contained in Exhibit 3 were untrue and were known to plaintiff to be untrue when Exhibit 3 was sent; [¶] 3. That as a result of the sending of Exhibit 3 by plaintiff, either of defendants' clients suffered special damages; [¶] 4. That Exhibit 3, when mailed or delivered by plaintiff was so mailed or delivered with actual malice and without a good faith belief by plaintiff that the statements contained therein were true when made; [¶] 5. That Exhibit 3, when mailed or delivered by plaintiff, could be reasonably understood by the average reader to be of a defamatory nature."

[11] Ross asserts that the jury should have been charged with BAJI No. 7.33 (Probable Cause for Criminal/Civil Prosecution). However, 7.33 was adopted in 1982 and not printed and included in the sixth edition pocket part until 1983. BAJI No. 6.39 was its predecessor and is indicated as the basis for instruction number 32.

[12] Instruction 41/42 provided: "In light of the law as I have explained it to you concerning libel, in order to have probable cause to institute the prior libel actions, the defendants herein must have had a reasonable, honest, good faith belief, based upon a reasonable and diligent investigation of the facts and law, that: [¶] 1. The alleged libelous statement was published by plaintiff. [¶] 2. The alleged libelous statement was false. [¶] 3. The alleged libelous statement was unprivileged. [¶] 4. The alleged libelous statement was published by plaintiff with actual malice. [¶] 5. If so, whether or not under all of the surrounding circumstances of the publication, which the law calls 'the inducement and innuendo' the published material taken as a whole had the natural and probable effect on the average reader with knowledge of the circumstances that Ed Dean and/or the Inglewood Daily News was defamed thereby. [¶] 6. If so, whether or not the publication by plaintiff was a proximate cause of special damage to Ed Dean and the Inglewood Daily News who could not recover damages in the prior actions without proof of such special damage proximately caused by publication of the alleged libelous statement."

ble cause existed; rather, it asks the jury to resolve the disputed factual issues, items 1 through 6, which underpin the issue of probable cause, to wit: whether Ross ". . . had a reasonable, honest, good faith belief, based upon a reasonable and diligent investigation of the facts and law. . . ." Instruction number 32 contained similar language and included five issues of fact to be resolved by the jury. While these and other instructions might have been more artfully drafted, it is clear that the court found that probable cause, as a matter of law, would exist if the jury found, based upon conflicting evidence, that the facts listed in instructions 32 and 41/42 existed.[13] As required by *Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d at page 682, the jury was called upon to determine the factual underpinnings of probable cause.[14]

We note that the record also indicates that Ross requested many instructions which were similar to those eventually given by the court and to which he now objects.

*Expert Testimony and Probable Cause*

■■■ Alternatively, Ross contends that reversal is required because Gerard failed to present expert testimony regarding what constitutes probable cause, that is, whether or not the actions of the attorneys in instituting and maintaining the action were reasonable. When the argument was propounded below as the basis for the JNOV, the court rejected it because Ross had failed to cite any case which held such expert testimony is required in a malicious prosecution case. All the cases which Ross had cited were concerned with legal malpractice suits, in which an issue had been raised concerning the standard of care.

On appeal, Ross continues to analogize to legal malpractice cases. The concern which sometimes prompts the need for expert testimony on standard of care in a legal malpractice setting simply does not exist in a malicious prosecution case. A legal malpractice action is brought when a client believes his or her attorney has breached the duty inherent in the relation-

---

[13] As related *ante,* Ross testified to the extent of the research he conducted before filing the first suit. Of course as the trier of fact, the jury was entitled to give whatever weight it deemed appropriate to this testimony or to disregard it altogether.

[14] Ross relies heavily on *Williams* v. *Coombs, supra,* 179 Cal.App.3d 626, a 1986 opinion which disagreed with prior appellate opinions and held that: "The reasonableness of defendant's investigation and research constitutes part of the legal element of probable cause and consequently tenders a legal issue for the court." (*Williams* v. *Coombs, supra,* 179 Cal.App.3d at p. 638.) The instant trial occurred in 1982; six years later, while the appeal is being perfected, a party urges application of a standard articulated four years posttrial. In this particular case, we find no compelling reasons which require a reversal of the judgment because of standards developed long after trial.

ship. A breach of this duty attacks the very heart of our legal process. To determine the validity of such an allegation, the trier of fact is entitled to the benefit of expert evidence as to the proof of the prevailing standard of skill and learning in the same or similar locality and the propriety of particular conduct by the practitioner. (*Lipscomb* v. *Krause* (1978) 87 Cal.App.3d 970, 976 [151 Cal.Rptr. 465].) These considerations do not necessarily translate to a malicious prosecution action where the plaintiff sues a stranger. Consequently, we are reluctant to require expert testimony on the reasonableness of Ross's behavior. In often very complex factual settings, juries are called upon to determine what is reasonable. We see nothing in the instant case which compels a conclusion that the jury was unable to do so.

*Jury Instruction Number 26*

 Ross objects to the language of instruction 26. We first note that Ross offered this instruction which was given, as modified.

The instruction is labeled "Re Dean's Belief or Lack of Belief." The language to which Ross objects was added by the court and provides as follows: "An attorney has a duty to represent his client zealously seeking any lawful objective through legally permissible means. So long as the attorney does not abuse that duty by prosecuting a claim which a reasonable lawyer would not regard as tenable or by unreasonably neglecting to investigate the facts and law in making his determination to proceed, his clients' adversary has no right to assert malicious prosecution against the attorney if the lawyer's efforts prove unsuccessful. *Tool Research*." This is almost a verbatim quote from *Tool Research & Engineering Corp.* v. *Henigson, supra,* 46 Cal.App.3d at pages 683-684, and while a quotation from a case does not always make a proper instruction, this instruction as given is not erroneous.

*Punitive Damages and the Law Firm*

We addressed this contention above and found the punitive damages imposed upon the law firm to be excessive.

*The 6 Percent Addition to the Compensatory Damages Award*

 Finally, Ross contends that there was no evidence that Gerard had the investment skills and acumen to manage money to produce a yield to keep pace with inflation; consequently, the award must be reduced by $3,885.30, the amount added by the jury. Ross cites *California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 40 [221 Cal.Rptr. 171], for this proposition. In *California Shoppers,* the jury had specified the

award was to compensate for loss of value of money due to inflation. Such is not the case at bench. In its special verdict, the jury added a factor of 6 percent to Gerard's actual damages without characterizing its origin. There is nothing to indicate that the jury did other than award a factor for interest as allowed by Civil Code section 3288.[15]

### DISPOSITION

The judgment is modified in the following respects:

The judgment notwithstanding the verdict in favor of the law firm is reversed. The $100,000 punitive damages judgment awarded against the law firm of Ross, Pierson & Letteau is reduced to $1,000.

In every other respect, the judgment is affirmed.

Plaintiff Gerard to recover costs for this appeal.

McClosky, Acting P. J., and George, J., concurred.

The petition of plaintiff and appellant for review by the Supreme Court was denied January 4, 1989.

---

[15] Civil Code section 3288 provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."