Filed 2/27/14  P. v. Shields CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PAUL ANDREW SHIELDS,<br><br>Defendant and Appellant. | C070929<br><br>(Super. Ct. No. 09F00482) |

Defendant, Paul Andrew Shields, stands convicted by a jury of unlawful sexual intercourse with a minor more than three years younger than the defendant, in violation of section 261.5, subdivision (c) of the Penal Code (unless otherwise specified, all statutory references that follow are to the Penal Code).  He admitted three prior convictions that brought him within the provisions of sections 667, subdivisions (b) to (i) and 1170.12, specifically a conviction for assault with a deadly weapon in violation of section 245, subdivision (a)(1) in 1991, a conviction for involuntary manslaughter with

1

personal use of a handgun in violation of section 192, subdivision (b) and section 12022, subdivision (b) in 1996, and a conviction for assault with a deadly weapon in violation of section 245, subdivision (a)(1) in 2000. Sentenced to 25 years to life in prison, he appeals.

On appeal, defendant contends: (1) he was prejudiced at trial by the court's failure to correctly instruct the jury on the defense of unconsciousness; (2) the sex offender registration order entered pursuant to section 290 was unauthorized; (3) a sexual battery fine was unauthorized; (4) a "no-visitation" order entered pursuant to section 1202.05 was unauthorized; (5) defendant is entitled to an award of presentence local conduct credits; and, (6) defendant is entitled to a retroactive application of Proposition 36.

We hold that (1) the trial court did not err in instructing the jury on the defense of unconsciousness to defendant's prejudice; (2) the sex offender registration order entered pursuant to section 290 must be reconsidered by the trial court on remand; (3) the sexual battery fine cannot stand because defendant was not convicted of a violation of section 243.4; (4) the "no-visitation" order entered pursuant to section 1202.05 was unauthorized; (5) defendant is entitled to an award of presentence local conduct credits; and (6) the defendant is not entitled to a retroactive application of the amendatory provisions of Proposition 36.

## FACTS AND PROCEEDINGS

The victim, K.C., testified that she met the defendant in approximately mid-November 2008 when she was visiting her father who, along with defendant, was incarcerated at San Quentin prison. At the time, K.C. was living with her mother and her siblings in Rancho Cordova.

Defendant was released from prison in the fall of 2008. Her mother had agreed to help defendant when he was released from prison and, initially upon his release, K.C. and her mother took defendant to a homeless shelter in the Bay Area.

2

At some point thereafter, K.C.'s mother took a job requiring her to work weekends in Oakland and it was arranged that defendant would watch K.C. and her siblings in their home in Rancho Cordova while their mother was away at work.

Defendant was at K.C.'s home on the weekend of December 13-14, 2008. On the evening of December 13, defendant and K.C. were watching movies on the television in the living room. K.C. was laying on her back on the floor with a pillow and a blanket wearing pajama bottoms and a T-shirt, but no panties. At some point, she fell asleep on the floor, but was awakened when she felt her pajama bottoms being removed and defendant licking her vaginal area. Because she was afraid, she pretended to be asleep.

When defendant was done licking K.C.'s vagina, he placed a pillow under her hips, put his penis in her vagina and began moving back and forth so that his penis was "going in and out" of her vagina. As far as she could tell, he was not wearing a condom. When defendant began having sexual intercourse with her, K.C. "got really scared" and "froze."

After defendant "was done," he left the living room and returned, handing her a washcloth or rag with no conversation between them. While he was out of the room K.C. pulled her pajama bottoms back up and, when he left after handing her the washcloth, she went straight into the bathroom. At that point she noticed that there was "clear fluid" coming from her vagina. After leaving the bathroom, defendant came up behind her and asked her whether she "like[d] it" after which K.C. went upstairs to her mom's room and went to bed.

During the night, defendant twice came into the room where K.C. was sleeping saying that he was sorry. K.C. made no response to his apology.

The weekend before this incident, when defendant was staying at K.C.'s home, he found her birth control pills in her bedroom. After she told him what they were he asked her whether she had ever given or received oral sex. She replied that she had not and ended the conversation.

3

The parties stipulated that defendant was 56 years old in December 2008.

Because he was representing himself, defendant testified on his own behalf through a narrative statement to the jury.

Defendant admitted he had sexual intercourse with K.C. on December 3, 2008.

Defendant is a diabetic and during the month or two before he was released from prison he was taking the medicine Glucophage and insulin injections, one injection in the morning and one in the evening. He was not given a glucose meter at the time he was released from prison and did not have one on December 13, 2008.

After describing some errands that he and K.C.'s family completed on December 13 during the day, defendant testified that they returned home. Defendant testified to the events that took place thereafter that evening as follows:

" . . . [K.C.] went into the living room and started decorating the [Christmas] tree, and I went into the den and was watching football.

"I stayed in there about an hour or an hour and a half, and then I went to the living room where [K.C.] was. She was finishing up decorating the tree, and she started explaining to me how she had hung our stockings according to our ages.

"And I brought up the subject to her about what she wanted to get her mother for Christmas. And she said that her mother had some Tiffany jewelry stolen from her, and then out of the clear blue she said this to me: She would have sex with me in exchange for getting that Tiffany jewelry. And I told her that that wasn't necessary. All you got to do is find a -- call the stores, get a price, and then I can see if I could get it. Then I told her that I had daughters her age, and then I explained to her and asked her did she remember that I told her that -- that I had just finished doing nine years for assaulting a man for saying that he would do the same thing to my six-year-old daughter. Also, I told her not to never disrespect me like that again. I would never stoop that low to disrespect your parents, you know. You know, I explained all that to her. And so I thought that was all over with. I thought she had got that notion out of her head.

4

"So she went upstairs, and she called a few stores. She came back downstairs, and she said she found a store. She found it in San Jose where I lived so I could get it without her mother knowing it. And I said okay. Then she went back upstairs, and then she came back down with a pillow and a blanket and asked me was I ready to watch the movies. I told her yes, I was ready, because we had bought movies when we were shopping.

"While we was watching movies -- I mean, before we started watching movies, I went upstairs and got me a pillow and some blankets, too, because there was no way I was going to share pillows and blankets with [K.C.]. And while I was upstairs, I asked her siblings why wasn't they downstairs watching movies with us. And [K.C.'s sister, S.], the oldest that was upstairs, said that [K.C.] had told them to stay upstairs. And I asked her why, and she said because they was making too much noise. I said -- I thought that was strange because they wasn't making as much noise as they usually make. And so I went on back downstairs and started watching TV, and we watched a movie. Like [K.C.] testified to, the first movie that we watched was What Love Has to Do with It [*sic*].

"And after that movie, [S.] came downstairs. [S.] came downstairs, and she got something out of the refrigerator. Then she came around the counter and told me that I still had some black walnut ice cream in the freezer. And I like black walnut ice cream, so I told her okay. But before I got the black walnut ice cream I wanted to go outside to smoke before the next movie started. So I went outside and smoked, and when I came back in [K.C.] had already started the movie, so I started watching the movie instead of getting the ice cream.

"But I did make the mistake of going upstairs, getting the syringe out of my backpack and coming back down with the intentions of eating the ice cream. So I got the syringe; came back downstairs; got my insulin out the refrigerator; and drew up 20 units of NPH. That's long-lasting insulin. And I drew up five units of regular. That's fast-acting insulin.

"The reason I took the regular is because I had ate a chocolate bar that day, earlier that day, but that was a mistake that I made. So after I took the insulin, I laid back down and still didn't get the ice cream. I didn't get nothing to eat. So going back through the movies, the other movie, watching some of the other movie, [K.C.] started dozing off. And I called her name once; I woke her up; and I told her to go to bed, go upstairs to bed. She refused. I did it twice; told her to go upstairs and go to bed. She refused. And I did it a third time. The third time she did get up.

"She got up; went upstairs; and I thought she had finally went to bed, but she didn't. She went upstairs and came back down shortly afterwards. I think she just went to see if her siblings were asleep."

Defendant's testimony continued as follows:

"[K.C.] came behind me and jumped on my back. When she jumped on my back, I kind of felt uncomfortable because I could feel her breasts on me. So I told her to move and get off me. So when she moved, she moved around to my left side. And when she moved around to my left side, she tried to pull me on top of her. When she tried to pull me on top of her, I put down my left hand to brace myself. And then after I tried to brace myself, she scooted up on my hand and I could feel her vagina. When I felt her vagina, I moved my hand, and she jumped up on her knees and grabbed me. She grabbed my private part, and that's when I got mad and shoved her. I didn't mean to shove her, but I shoved her and started screaming at her, and that's the only time she left and went back and laid down.

"Once she did that, I went back outside and smoked another cigarette. When I came back in -- oh, while I was outside smoking that cigarette, I felt -- I felt shaky, confused, and fatigued. So I came back inside and laid down again. I laid down, and I started to shaking worse, and I knew that I was on the verge of having a hypoglycemia [*sic*] attack, and I knew I had to get [K.C.] to get my glucose out of my backpack. Once I tried to get to [K.C.], I crawled over to [K.C.] -- or towards [K.C,]. I don't remember

6

nothing else after that, but when -- when I did focus again, I was on top of [K.C.] and -- and that was the -- the act was over with.

"And after that I got up, still in a daze, still not comfortable feeling the way I was supposed to be feeling. So I did get up, and I know I apologized to [K.C.], and I went into the kitchen and made a sandwich to try to get my blood sugar up. One of the reasons I suffered that hypoglycemia [*sic*] attack was remember when I said that they came to pick me up after work, well, when I couldn't cash my check, I didn't have an opportunity to ask Robin to stop somewhere where I could buy something to eat because I knew they had already eaten dinner. So I had to go all night without eating. One of my biggest problems when I was spending the night with Robin was I didn't like taking food out those kids' mouths because she was struggling as it was to take care of four kids. So I was hesitant to eat at her house. So I made a lot of mistakes concerning my diabetes, you know, but it wasn't intentionally.

"I thought I was doing the right thing by trying to not take food from they [*sic*] mouths. I had no intentions of ever doing anything to hurt that family because, like I said, I have four daughters of my own. And I've never been charged with this kind of crime. I had -- did a lot of time in my life, but nothing like this."

On cross-examination, defendant said that after he returned to the house the second time after going out to smoke a cigarette, he entered into a "semiconscious" or "semi-unconscious" state. The next thing he remembers was being on top of K.C. with his penis in her vagina at which time he looked down and saw her hand on his hip and then got up off of her. Without making a remark one way or the other, he went into the bathroom to clean himself up and then returned to the living room and apologized to K.C.

Defendant explained that when he described himself as "semiconscious" he meant that he was unaware of his actions and he was unaware of K.C.'s actions. He was incapable of responding as a "respectable adult." He was "semiconscious" to the extent

7

that he remembers asking K.C. to go upstairs to get him his glucose. After that, he does not remember what happened.

## DISCUSSION

## I

### *The Instructions Regarding the Defense of Unconsciousness*

Defendant contends that the trial court erred in three particulars in instructing the jury on the defense of unconsciousness. First, he argues that the trial court's failure to instruct the jury that unconsciousness does not require that a person be incapable of movement was error; second, that the trial court's instruction on the "presumption of consciousness" was error; and, third, that the trial court erred in failing to instruct on involuntary intoxication as a basis for unconsciousness.

We address those arguments in order.

### A.    The Instruction Regarding the Ability to Move While Unconscious

At the instruction conference, without objection from the defendant, the court stated it would instruct the jury on the defense of unconsciousness in the language of CALCRIM No. 3425 [2008 version; hereinafter former CALCRIM No. 3425] which, in part, tells the jury that the law is that someone can be considered legally unconscious even though he is able to move physically. For reasons not explained in the record, the trial court did not so instruct, either orally or in the written instructions given to the jury.

Defendant argues, without a citation to authority, that the "common understanding of the word, 'unconscious' means a state of sleep, stupor or coma where the person lies still and unresponsive, incapable of locomotion or manual action." He argues that the court's failure to dispel this "common understanding" in the minds of the jurors was prejudicial error.

8

We reject defendant's argument for a number of reasons, not the least of which is that defendant's first premise, that it is commonly understood that a person is unconscious only when he cannot move physically, fails.

In common understanding, it is not uncommon to recognize or experience unconscious physical actions. Biting one's fingernails or tapping one's foot without realizing one is doing so come to mind. Indeed, the standard dictionary definitions of "unconscious" specifically refer to unconscious "actions." Thus, the Oxford English Dictionary includes in its definitions of the word "not conscious or knowing within oneself; unaware" and "not attended by, or present to, consciousness; performed, employed, etc., without conscious action." (Oxford English Dict. <http://www.oxfordreference.com> [as of Feb. 27, 2014].) And, the Merriam-Webster on-line dictionary defines the word to include "not knowing or perceiving," "not aware," "not marked by conscious thought, sensation, or feeling." (Merriam-Webster's Dict. <http://www.merriam-webster.com/dictionary/unconscious> [as of Feb. 27, 2014.) Thus, in common parlance, it is known that someone can be in a state of unconsciousness while retaining the ability to move physically.

In this matter, there was no suggestion to the jury that the legal defense of unconsciousness was not available to defendant if he could move physically. While it is true that the jury received the standard instruction telling them that certain instructions may or may not apply depending on their findings on the facts, they could reasonably conclude that the defense of unconsciousness might apply under the facts of this case by virtue of the court instructing them on the defense and, thus, might apply even though the defendant was physically moving while unconscious under his version of the events of the evening.

On this point, the California Supreme Court's opinion in *People v. Hughes* (2002) 27 Cal.4th 287 (*Hughes*) is instructive. In *Hughes*, the defendant argued, as defendant argued here, that the trial court erred in failing to instruct the jury that unconsciousness

9

under the law does not require that a person be incapable of movement. The court concluded that "[b]ased upon the state of the evidence before the jury when it heard [the instruction on unconsciousness], it is not reasonably likely that the jury was misled into believing that it was precluded from finding unconsciousness merely because there was evidence that defendant moved about and engaged in various affirmative activity." (*Id.* at p. 344.)

So too here. The jury heard the evidence relating to defendant's claim that he was legally unconscious during the time he moved physically to engage in an act of sexual intercourse with K.C. and was then instructed, as noted above, that it could consider a defense of unconsciousness under the facts of the case given the evidence before them. Nothing during the course of the trial even suggested that the defense was unavailable because the defendant was capable of physical movement.

Defendant argues that the People suggested in closing arguments that the defense was not available because the defendant was not motionless during the acts leading up to and including sexual intercourse with the victim. We do not read the deputy district attorney's remarks that way. During his closing argument, he did nothing more than point out that defendant's defense was unlikely in the extreme because the jury would have to accept the facts that, as and after he passed into unconsciousness, K.C. removed or lowered defendant's pants and removed her own clothing and positioned defendant on top of her and, further, that in his unconscious state, he was able to achieve an erection and engage in sexual intercourse to the point of ejaculation, shortly after which he regained consciousness and realized what he was doing. There was nothing in counsel's argument that suggested that defendant's claim of unconsciousness had to be rejected solely because he was able to move physically while unconscious.

There was no instructional error in failing to make explicit the point that the jury must have necessarily inferred.

10

B.      The "Presumption of Conscious"

Noting this court's opinion in *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1301, 1323 (*Mathson*) criticizing the third paragraph of former CALCRIM No. 3425 and finding it "flawed" and "problematic" under the facts of that case, defendant argues that the instruction violated his right to due process of law because, in its ambiguity, it "creat[ed] a mandatory, conclusive presumption of consciousness."

The third paragraph of former CALCRIM No. 3425 as given to the jury in this matter, reads:

"The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted.  If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious.  If, however, based on all the evidence, you have a reasonable doubt that (he/she) was conscious, you must find (him/her) not guilty."  (Former CALCRIM No. 3425.)

We note, first of all, that *Mathson* did not hold, or necessarily suggest, that the language of former CALCRIM No. 3425 creates a mandatory, conclusive presumption of consciousness and, second, that the *Mathson* case dealt with a question relating to unconsciousness caused by alcohol intoxication which explains the court's criticism of the last sentence of the paragraph as applied to that case.

In any event, we do not find that the language of the last paragraph of the instruction, quoted above, creates a mandatory, conclusive presumption.  It simply advises the jury that, if a defendant acts as if he is conscious, then he should be found to have been conscious.  If, on the other hand, there is evidence that raises a reasonable doubt that he was conscious, he must be found not guilty.  The instruction, read as a whole, does not require the jury to find that a defendant is conscious based on the mere fact that he is able physically to move during the course of his crime.  The instruction

11

tells the jury that it should presume defendant was conscious if he acted as if he were conscious unless the jury, based on all the evidence including his physical movements or lack thereof, has a reasonable doubt that he was conscious of his criminal acts at the time he undertook them in which case he should be found not guilty, that is, that any presumption of conscious is rebuttable and not conclusive.

There being no mandatory, conclusive presumption in the instructions that the defendant was conscious of his acts, there was no lessening of the People's burden of proof and no violation of the defendant's right to due process of law.

    C.    <u>An</u> <u>Instruction</u> <u>on</u> <u>Involuntary</u> <u>Intoxication</u>

Defendant argues that defendant's request for an "accident" instruction in the form of CALCRIM No. 3404, should have alerted the trial court of a need to give, *sua sponte* an instruction on unconsciousness resulting from involuntary intoxication.

The People counter, in part, by arguing that defendant has forfeited this argument on appeal due to his failure to specifically ask for an instruction on involuntary intoxication. Defendant replies that the defendant in fact did do enough to alert the court to the need for such an instruction when defendant asked for an instruction on the defense of "accident[]." We need not decide this point because we hold that the instructions were a correct statement of the law and were adequate to advise the jury as to the defense of unconsciousness under the facts and circumstances of this case.

The second paragraph of former CALCRIM No. 3425 reads as follows:

"Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] sleepwalking[,]/ or _____ *<insert a similar condition>*)."

Because the evidence did not suggest that defendant's lack of consciousness at the time of the act of sexual intercourse was caused by a blackout, an epileptic seizure,

12

involuntary alcohol intoxication, or sleepwalking, the trial court chose to describe the condition that caused the asserted lack of consciousness as a "medical condition."

Although, for purposes of this appeal, we may accept the defendant's argument that involuntary intoxication can be caused by the voluntary ingestion of prescription medication (see *Mathson, supra,* (2012) 210 Cal.App.4th at p. 1313), we fail to see, under these circumstances, what such an instruction would have added to the defense that defendant relied on before the jury. The trial court told the jury that a legal state of unconsciousness, and, thus, a full defense to the charges they were to consider, could be caused by a "medical condition." The evidence at trial was uncontradicted that defendant, suffering from diabetes, injected insulin which in turn rendered him hypoglycemic and, according to him, legally unconscious. The jury was told, in effect, that a medical condition, presumably given the evidence before the jury, diabetes, could, in some circumstances, cause a lack of legal consciousness. The trial court's instruction supported defendant's theory of the case. To have told the jury that defendant's voluntary injection of insulin could have led to involuntary intoxication and a lack of legal consciousness would have added nothing and would have been potentially confusing.

Moreover, the trial court's willingness to instruct on the defense of unconsciousness was generous under the circumstances given that, other than the defendant's say-so, there was no evidence presented to the jury, expert or otherwise, that the injection of insulin in the amount defendant injected, medically could lead to a hypoglycemic state of unconsciousness that would allow the unconscious diabetic to engage in an act of sexual intercourse without being aware of his actions.

The jury was instructed in a manner that was consistent with the defense here presented and no more was required. There was no error.

13

## II

### *The Section 290 Registration Order*

Defendant points out that his conviction for a violation of section 261.5 is not a conviction that requires sex offender registration under section 290 and that there is no indication in the record that the trial court exercised its discretion to so order pursuant to section 290.006. The People agree. We accept the concession.

In this matter, it appears the trial court ordered defendant to register as a sex offender pursuant to section 290 based upon the probation report's erroneous statement that the offense of which defendant stood convicted was one which came within the mandatory registration requirement set forth in that statute. Given that portion of the probation report, the court did not undertake to exercise its discretionary authority to order defendant to register as a sex offender under section 290.006. Under the circumstances, we will remand the matter to the trial court for its determination whether defendant should be ordered to register as a sex offender pursuant to the provisions of section 290.006. (See *People v. Hofsheier* (2006) 37 Cal.4th 1185, 1208-1209; *People v. Thompson* (2009) 177 Cal.App.4th 1424, 1431.)

## III

### *The Sexual Battery Fine*

Defendant next argues the court erred in assessing a $600 fine for sexual battery pursuant to section 243.4 since defendant was not convicted of that offense. The People concede that, defendant not having been convicted of a violation of section 243.4, the court erred in assessing a fine pursuant to that section. But the People argue, first, that defendant forfeited this assignment of error by not making an objection in the trial court and, second, that, since the court had the authority to assess what the People describe as a "civil fine" of up to $10,000 pursuant to section 261.5, subdivision (e)(1)(C), the $600 fine was somehow "authorized." We disagree with both of the People's arguments.

14

Regarding forfeiture, the People rely on *People v. Scott* (1994) 9 Cal.4th 331 (*Scott*).  In *Scott* our Supreme Court held that the forfeiture doctrine "should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"  (*Id.* at p. 353.)  The court added that forfeited claims, "[i]n essence, . . . involve sentences which, though otherwise permitted by law, were imposed in a procedurally or factually flawed manner."  (*Id.* at p. 354.)

The court in *Scott* also addressed "unauthorized sentence[s]" (defendant's claim here), which are not forfeited by failure to object in the trial court and can be raised for the first time on appeal.  The court explained that "[a]lthough the cases are varied, a sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case.  Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing."  (*Scott, supra,* 9 Cal.4th at p. 354.)

It does not require us to turn to a citation of authority to conclude that the sentencing error complained of here amounted to an unauthorized sentence.  Put simply, a trial court could not have lawfully imposed a $600 fine under a statute describing a crime the defendant did not commit.  The error was not forfeited.

We also reject the People's second argument.  Section 261.5 provides in part that an adult who violates that section may be liable for a civil penalty (inaccurately denominated a civil "fine" by the People) up to, in defendant's case, $10,000.  (§ 261.5, subd. (e)(1)(C).)  This provision does not call for a "fine," but is, instead, a potential civil monetary penalty that may be assessed after the district attorney brings an action to recover the penalty pursuant to section 261.5 subdivision (e)(2).  The money recovered is used to offset the costs of pursuing the action and is placed with the treasurer of the county in which the judgment is entered, any overage to be deposited in the Underage Pregnancy Prevention Fund.  (*Ibid.*)  The statute thus provides for a civil action against a defendant who commits the crime set forth therein.  The provision for a "fine" for a

15

violation is set forth in section 261.5, subdivision (e)(3).  To the extent the People's argument is essentially that, since defendant could have been (or could be) subject to a civil penalty of up to $10,000, a $600 fine amounts to no harm, no foul, we reject that reasoning as well.

We will strike the $600 fine imposed under the authority of section 243.4.

IV

*The No-Visitation Order*

At sentencing, the trial court ordered that the defendant would have no visitation privileges with K.C., an order entered pursuant to section 1202.05.  Defendant contends the order is unauthorized because (1) a violation of section 261.5 is not one of the offenses enumerated in section 1202.05 and (2) K.C. had reached the age of majority at the time of defendant's sentencing and section 1202.05 is intended only to prohibit prison visitation between adult offenders and their minor victims, citing *People v. Scott* (2012) 203 Cal.App.4th 1303.  The People agree the order was unauthorized.  We agree, too, and we will strike the order.

V

*Presentence Conduct Credits*

The trial court did not award presentence conduct credit under the mistaken impression that it was precluded from doing so because the court was sentencing defendant to an indeterminate sentence in prison.  Citing a number of cases that hold to the contrary, defendant argues that he is entitled to 568 days of presentence conduct credits.  Once again, the People concede the error but, relying on *People v. Saldivar* (1984) 154 Cal.App.3d 111 (*Saldivar*), argue that the matter should be remanded to the trial court for that court's determination of the defendant's conduct while in local custody.

16

We agree the trial court erred in refusing to order presentence conduct credits, but we do not agree that the matter should be remanded to the trial court. Unlike *Saldivar* where the record reflected reasonably substantial evidence that the juvenile in that matter had, in fact, been highly aggressive, had threatened the case worker, had been placed in a security room where he was found with a piece of metal shaped into a weapon (*Saldivar, supra*, 154 Cal.App. 3d at p. 115), in other words substantial evidence that the juvenile did not have a right to presentence custody credits, there is no evidence on this record of defendant's having misbehaved while in local custody pending trial. And we think there would have been had misbehavior occurred. We note that the probation report prepared prior to sentencing, under the heading "Jail Behavior," reported only that defendant attempted suicide and precautions were taken to keep the defendant safe and to keep him from harming himself. We note also that the court in *Saldivar* undertook an assessment of conduct credits and determined the matter itself without remanding to the juvenile court for its further consideration.

Under these circumstances, it is appropriate to order that defendant shall be awarded 568 days of local conduct credit.

## VI

### *Proposition 36*

Finally, defendant argues that, by way of a retroactive application of Proposition 36, he is entitled to a remand for resentencing under the provisions of section 1170.12, subdivision (c). Defendant asks us to follow the Fourth District Court of Appeal decision in *People v. Lewis* (2013) 216 Cal.App.4th 468, review granted, Aug. 14, 2013, S211494 (*Lewis*) which held that Proposition 36 should have retroactive effect. Before *Lewis*, the Fifth District Court of Appeal decided section 1170.12 did not have retroactive effect in *People v. Yearwood* (2013) 213 Cal.App.4th 161 (*Yearwood*). After *Yearwood*, but before *Lewis*, this court decided *People v. Conley* (2013) 215 Cal.App.4th 1482 review

17

granted, Aug. 14, 2013, S211275 which, among other things, held that Proposition 36 applied only to those persons not yet convicted or not yet sentenced.

It is safe to say that the law in this area is unsettled although *Yearwood*, at present at least, remains good law.

Defendant argues section 1170.12, applies to him because his third-strike sentence is not yet final on appeal thus requiring a remand of his case to the trial court for resentencing. Central to his argument is the case of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). In *Estrada* the Supreme Court held that "where the amendatory statute mitigates punishment and there is no saving clause, . . . the amendment will operate retroactively so that the lighter punishment is imposed" in all cases in which the judgment was not yet final when the amendment took effect. (*Id*. at p. 748.)

Section 1170.12 does not have an express saving clause. But even in the absence of an express saving clause, the rule in *Estrada* does not apply if the Legislature by other language "clearly signals its intent to make the amendment prospective." (*People v. Nasalga* (1996) 12 Cal.4th 784, 793.) " '[W]hat is required is that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' [Citation.]" (*Ibid*.)

Statutes enacted into law through the initiative process are construed in the same manner, and are subject to the same principles as, statutes enacted by the Legislature. (*People v. Elliot* (2005) 37 Cal.4th 453, 478.) One of the most important principles is that statutes dealing with the same subject matter—commonly referred to as statutes "in pari materia"—should be construed together. (*People v. Honig* (1996) 48 Cal.App.4th 289, 327.) Application of this rule is especially appropriate in cases where statutes relating to the same subject matter were passed at the same time. (*Stickel v. Harris* (1987) 196 Cal.App.3d 575, 590.) Section 1170.126, a related statute added by Proposition 36, defeats the presumption of retroactivity set forth in *Estrada*. It authorizes

limited application to prisoners serving three strikes sentences when the measure was enacted and establishes a specific procedure for defendant to follow in this case.

In particular, section 1170.126 provides for the resentencing of "persons presently serving an indeterminate term of imprisonment pursuant to paragraph (2) of subdivision (e) of Section 667 or paragraph (2) of subdivision (c) of Section 1170.12, whose sentence under this act would not have been an indeterminate life sentence." (§ 1170.126, subd. (a).) A person serving a three strikes sentence for a current conviction that is not a serious or violent felony "may file a petition for a recall of sentence, within two years after the effective date of the act that added this section or at a later date upon a showing of good cause, before the trial court that entered the judgment of conviction in his or her case, to request resentencing in accordance with" Proposition 36. (§ 1170.126, subd. (b).) An inmate is eligible for resentencing unless he has prior convictions for certain specified offenses. (§ 1170.126, subd. (e).) If the prisoner is eligible, then the trial court will resentence the defendant "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) The factors governing the exercise of the trial court's discretion—the prisoner's criminal history, record in prison, and any other relevant evidence—are set forth in section 1170.126, subdivision (g).

In light of this scheme, which provides for limited application of Proposition 36 to prisoners serving three-strikes sentences at the time of its enactment, the presumption in *Estrada* does not apply as to them; it applies only to those people not yet convicted or not yet sentenced. Those already sentenced and serving an indeterminate term of imprisonment must petition the trial court for a recall of sentence regardless of whether or not their judgment is final. Nothing in section 1170.126 states that its reference to "persons presently serving an indeterminate term of imprisonment . . . whose sentence under this act would not have been an indeterminate life sentence" is meant to apply only to those serving a term of imprisonment under a final judgment. (§ 1170.126, subd. (a).)

19

We may not insert such words into the statute.  (Code Civ. Proc., § 1858; *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826-827.)

Our conclusion that section 1170.12 does not apply retroactively is supported by *Yearwood*.  *Yearwood* buttressed its conclusion by referencing the voters' intent in approving the Act and by ballot arguments.  According to *Yearwood*, enhancing public safety was a key purpose of the Act.  A prospective-only application of the Act supports the Act's public safety purpose by reducing the likelihood that prisoners who are currently dangerous will be released from prison due to the Act.  If the Act were given retroactive application, prisoners in defendant's position would be entitled to automatic resentencing without any judicial review to ensure they do not currently pose an unreasonable risk of danger to public safety.  The time period between sentencing and finality of judgment can span years, and prisoners can increase in dangerousness during this interval.  Such a "loophole," the court reasoned, would be inconsistent with the public safety purpose of the Act. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 176.)

Although not raised specifically here, we note in passing that *Yearwood* also rejected the argument that failing to apply the mandatory ameliorative benefits of Proposition 36 retroactively would violate the equal protection clause of the federal Constitution, noting that the rational relationship test is the appropriate test, and concluding:  "Prospective application of amended sections 667 and 1170.12 furthers legitimate interests and does not unfairly discriminate against appellant.  A prisoner who was sentenced to an indeterminate life term before the Act's effective date may file a section 1170.126 petition upon finality of the judgment.  If qualified, the prisoner will ordinarily receive the same sentencing reduction that would have been obtained if he or she had been resentenced under amended sections 667 and 1170.12.  The discretionary public safety exception to second strike sentencing that is present in section 1170.126, but not in amended sections 667 and 1170.12, is rationally related to a legitimate state interest.  It increases the likelihood that prisoners whose sentences are reduced or who are

20

released due to the Act will not pose an unreasonable risk of danger to the public." (*Yearwood*, *supra*, 213 Cal.App.4th at pp. 178-179.)

In any event, we agree with *Yearwood* and for that reason reject defendant's argument to the same effect.

## DISPOSITION

The judgment is modified to strike the $600 fine imposed pursuant to Penal Code section 243.4, to strike the no-visitation order imposed pursuant to Penal Code section 1202, and to order the award of 568 days presentence conduct credit. The matter is remanded to the trial court for its consideration of whether defendant should be ordered to register as a sex offender pursuant to Penal Code section 290.006. In all other respects, the judgment is affirmed. The trial court shall prepare an amended abstract of judgment consistent with this disposition and send a certified copy to the Department of Corrections and Rehabilitation.


    HULL    , J.


We concur:


    NICHOLSON    , Acting P. J.


    HOCH    , J.